### UNITED STATES of America
### v.
### Samuel Rizzo DE CAVALCANTE, Appellant in No. 19310, Gaetano Dominick Vastola and Daniel Annunziata.
### Appeal of Gaetano Dominick VASTOLA, in No. 19,311.
### Appeal of Daniel ANNUNZIATA, in No. 19,312.
### Nos. 19310–19312.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1970.

Decided March 10, 1971.

Aldisert, Circuit Judge, concurred and filed opinion.

Leon H. Kline, Philadelphia, Pa., for appellant Samuel Rizzo De Cavalcante.

Querques, Isles & Weissbard, Orange, N. J., for appellants Gaetano Dominick Vastola and Daniel Annunziata; Michael A. Querques, Orange, N. J., of counsel.

George J. Koelzer, Asst. U. S. Atty., Newark, N. J., for appellee.

Before ALDISERT, ADAMS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The three appellants here were convicted of a conspiracy[1] to extort in violation of 18 U.S.C. § 1952,[2] and De Cavalcante was also convicted on two counts alleging substantive violations of § 1952. The events alleged to constitute the crimes occurred in the latter part of 1966. The defendants were indicted on May 22, 1968, and were tried in September, 1970. After an eight-day trial before a jury, the defendants were found guilty. De Cavalcante received the maximum sentence of three consecutive terms of imprisonment of five years each; Vastola received a single term of five years; Annunziata received a term of three years.

---

1. 18 U.S.C. § 371:
   "If two or more persons conspire * * to commit any offense against the United States * * *, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. 18 U.S.C. § 1952:
   "(a) Whoever travels in interstate or foreign commerce * * * with intent to—
   (3) * * * promote, manage, establish, carry on, or facilitate the promo-

tion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraph * * * (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
   (b) As used in this section 'unlawful activity' means * * * (2) extortion * * * in violation of the laws of the State in which committed or of the United States."
   The state statutes alleged to be violated are N.J.S.A. §§ 2A:105-3, 2A:105-4 (1969).

On this appeal the appellants have raised a number of significant issues, but we find it necessary to deal only with three of them: whether interstate travel by the victims of a crime is sufficient to satisfy the travel requirements of 18 U.S.C. § 1952; whether the prosecution improperly altered the indictment in this case; and whether the defendants were entitled to judgments of acquittal on the conspiracy count.

The facts may be summarized as follows. In September, 1966, Thomas Coogan, Kenneth Martin, Morris Wasserman, James Smith, James Brennan, and Patrick Dello Russo were conducting illegal gambling—using crooked dice—at the Americana Motel in Trevose, Pennsylvania. Defendants Vastola and Annunziata heard of this gambling, went to Trevose on September 27th, and engaged the other six men in a short dice game. After losing a few hundred dollars, Vastola complained of the small amount of bets, threw what was purported to be $10,000 in cash on the table, and said he and Annunziata would be back the following evening to play for higher stakes.

The next night the eight men proceeded to use legitimate dice for about ten minutes. At that point Smith alerted his cohorts that he was about to introduce the crooked dice by giving to Brennan the agreed upon signal: "It's up to you." But before the dice were thrown, Vastola and Annunziata drew their revolvers and ordered everyone not to move. Vastola told the gamblers that he had heard they were robbing "his people" from New York and he was now going to rob them. While Annunziata held the others at gunpoint, Vastola took $2,800 from the gamblers, demanded $300 per week from them, and took the "crooked dice" to show "his people" how they had been cheated.

After Vastola and Annunziata left the Americana Motel, Brennan told the others he would ask De Cavalcante to help them settle the dispute. On September 30th, the six men met with De Cavalcante and Vastola at De Cavalcante's office in Kenilworth, New Jersey. De Cavalcante stated that Vastola had told him that he wanted $20,000 from the gamblers, and that he thought Vastola had a "legitimate complaint." When Vastola began shouting at the gamblers, De Cavalcante told Vastola to calm down and left the room with him. Upon returning to the room alone, De Cavalcante said he had persuaded Vastola to accept $12,000 in "settlement" from the gamblers. When Vastola then demanded cash payment, the gamblers complained of not having that much money. De Cavalcante told them he would pay Vastola directly for them, and that they could then pay him back. De Cavalcante sent Dello Russo to see a money lender in Brooklyn for his part of the repayment, and said Brennan could deduct his share from money which De Cavalcante owed him. On October 1, 1966, Martin and Smith met De Cavalcante at Swift's Colonial Diner in Trenton, and paid him $3,000. Further payments of $400 each were made to De Cavalcante in New Jersey on October 12th and on October 26th, but no separate crime is charged regarding their last two payments.

On October 1st, the Philadelphia office of the Federal Bureau of Investigation received an anonymous telephone call indicating that the six gamblers were being extorted. A federal grand jury was convened on October 26th to investigate the charges and eventually brought the indictments in this case.

The Government's theory is that Brennan and Dello Russo were in conspiracy with De Cavalcante, Vastola and Annunziata to extort money from the Philadelphia gamblers. The defense answers that while Vastola and Annunziata certainly committed the crime of robbery in Trevose, no federal statute was thereby violated. They argue that the evidence does not show any conspiracy, and that De Cavalcante was merely a friendly arbitrator in a dispute between two groups of hoodlums—a role which, however unsavory, does not amount to a violation of 18 U.S.C. § 1952.

## I. THE CONSPIRACY COUNT OF THE INDICTMENT

### A. Sufficiency of the Indictment

Each of the three counts of the indictment charged in substance as follows: that De Cavalcante "did wilfully aid, abet, counsel, command, induce, procure, and *cause* Thomas Coogan, Morris Wasserman, Kenneth Martin and James Marion Smith to travel in interstate commerce * * * with intent to promote, manage, establish, carry on, and facilitate * * * extortion * * *" (emphasis added).

The problem here arises because rather than being confederates, Coogan, Wasserman, Martin and Smith were the victims of the alleged crime. The first question presented therefore is whether a crime has been charged under 18 U.S.C. § 1952 when the interstate travel in question is by the victims of the extortion rather than by the alleged extorters.

■ Standing alone, § 1952 is not violated by such travel. However, for unexplained reasons, the Government chose to use the aiding and abetting language of 18 U.S.C. § 2:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

■ Since one cannot aid and abet someone to do an innocent act within the meaning of § 2(a), *see e.g.,* United States v. Provenzano, 334 F.2d 678, 691 (3rd Cir. 1964), the Government argues for the application of § 2(b) to this case, based upon the inclusion in the indictment of the words "did * * * cause."

■ Applying § 2(b) to § 1952 in effect makes possible the separation of the travel requirement from either the intent or overt act requirements. Such separation causes both semantical and conceptual problems in applying § 1952. However, the Committee on the Judiciary made clear when Title 18, United States Code was revised and codified that § 2(b) was to make culpable one who "causes the commission of an indispensable element of the offense by an innocent agent or instrumentality. * * *" H.R.Rep. No. 304, 80th Cong., 1st Sess. A5 (1947). Indeed, Dyer Act prosecutions for interstate transportation of stolen automobiles, while not squarely in point, often invoke this principle. E.g., United States v. Leggett, 269 F.2d 35 (7th Cir. 1959). Similarly, in United States v. Kelley, 395 F.2d 727 (2d Cir. 1968), a bookmaker was found guilty—on the basis of § 2(b)—of violating § 1952 where the only use of interstate commerce was by prospective bettors calling the bookmaker on the telephone. It is true that in both *Leggett* and *Kelley* the interstate travel element was provided by the actions of one who, while innocent of a crime, could be viewed as the alter ego of the criminal. But use of the word "causes" in the statute conveys an intent sufficiently broad to encompass not only voluntary acts of true agents, but also the involuntary acts of victims. Although the Government has pointed to no case in which actions of a victim were alleged to provide one element of the crime charged under § 1952, and although the indictment in this case was no doubt inartfully drawn, we find the allegations in the indictment here to be sufficient to charge a crime under § 1952.[3]

---

3. The Ninth Circuit in United States v. Roselli, 432 F.2d 879, 890–891 (9th Cir. 1970), has held that knowing interstate travel is not an element of the substantive crime under § 1952, or of conspiracy under § 371, but that the travel requirement is merely a prerequisite for federal jurisdiction to attach. *See also* United States v. Blassingame, 427 F.2d 329 (2d Cir. 1970).

## B. Amendment of the Indictment

An equally significant attack is made by the defendants upon what they view as a major difference in the theory of the crime as charged by the grand jury, and the premise upon which the defendants were convicted. The conspiracy count of the indictment charged as follows:

"From on or about September 27, 1966, to on or about November 16, 1966, in the State and District of New Jersey and elsewhere, the defendants SAMUEL RIZZO DE CAVALCANTE, GAETANO DOMINICK VASTOLA, and DANIEL ANNUNZIATA unlawfully, wilfully, and knowingly did combine, conspire, confederate, and agree together and with each other, and with divers other persons *whose names are to the Grand Jury unknown,* to commit offenses against the United States, * * * " (emphasis added).

The grand jury handed down this indictment on March 22, 1968. The defendants, in late April, moved for discovery and a bill of particulars, asking for, among other things, the names of all alleged co-conspirators, including specifically those denominated in the indictment as "divers other persons." On May 15, 1968, the United States replied "that it does not know the identity of any co-conspirators not named in Count One of the indictment." A similar statement was made by the Government on November 10, 1969—eighteen months later—at a hearing on defendants' discovery motions. Finally, on March 30, 1970, the new Assistant United States Attorney who had assumed responsibility for the case sent a letter to the defendants, saying that the statement made by his predecessor on November 10th had been "inadvertant," and he named Brennan and Dello Russo as co-conspirators. The case thereafter was in fact tried, despite defense objections, on the theory that Brennan and Dello Russo were co-conspirators with De Cavalcante, Vastola and Annunziata in the alleged extortion plot, acting as "shills" in the crooked dice game to set up the opportunity whereby De Cavalcante would cause the gamblers to cross state lines and be extorted. While neither Brennan nor Dello Russo testified at trial, the Government admitted at the oral argument in this Court that their participation as co-conspirators was essential to make out the substantive crime, for otherwise there would be no basis for the theory of a conspiracy.

In considering this point, it is important to note first what questions are not raised on this appeal concerning the indictment. There is no Sixth Amendment[4] problem of adequate notice to the defendants of the crime charged. *See e.g.,* Russell v. United States, 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Nelson v. United States, 406 F.2d 1136 (10th Cir. 1969). Defendants concede that the letter from the Assistant United States Attorney more than five months before trial adequately apprised them of the Government's theory of the case. Similarly, there is no problem of insufficient particularity of the charge in the indictment. The requirement of particularity not only serves a notice function, but also helps implement the Fifth Amendment's protection against being put twice in jeopardy for the same offense. *See* Russell v. United States, *supra,* 369 U.S. at 763–764, 82 S.Ct. 1038. The indictment here clearly charged the crime of extortion in violation of 18 U.S.C. § 1952, identifying with ample specificity for double jeopardy purposes the time, place and circumstances of the crime. *See* Fed.R. Crim.P. 7(c).

What is at issue in this case is whether defendants were tried on the specific charge brought by the grand

---

4. Amendment VI to the Constitution: "In all criminal prosecutions, the accused shall enjoy the right * . * * to be informed of the nature and cause of the accusation * * *."

jury. The Fifth Amendment provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * * ".[5] Although the institution of the grand jury was known as early as the twelfth century,[6] the modern requirement for a grand jury indictment seems to have grown out of abuses which developed in the practice of prosecutions brought by "appeal".[7] The indictment was intended to protect people from false accusations brought by others. By the mid-fourteenth century, the principle of the modern grand jury was established, although not yet always enforced, requiring an indictment by "people of the neighborhood" before a man was called to answer for a crime.[8] In his treatise on the Constitution, Justice Story noted this shielding function of the grand jury, stating that "grand juries perform most important public functions, and are a great security to the citizens against vindictive prosecutions, either by the government or by political partisans, or by private enemies."[9]

By the time of Ex Parte Bain, 121 U.S. 1, 9–10, 7 S.Ct. 781, 786, 30 L. Ed. 849 (1887), the following basic principles had been firmly established in this country: "The party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part."[10] In Bain, a writ of habeas corpus was granted where the trial court had struck certain words from the indictment on the ground that they were immaterial. The Supreme Court thought it possible that the grand jury's indictment might have been based on findings reflected by the stricken part. The prohibition against amendment of an indictment other than by the grand jury itself, enunciated in Bain, was reaffirmed in Stirone v. United States, 361 U.S.

---

5. Compare Fed.R.Crim.P. 6(c), 6(f).

6. Some trace the regular use of the inquest, from which the grand and petit juries evolved, to the reign of Henry II (1154–1189). Schwartz, The Roots of Freedom 65 (1967); Milsom, Historical Foundations of the Common Law 357–8 (1969).

7. This procedure has been described as follows:

"Individuals could bring charges, and very often did, by the procedure known as the appeal * * * Such individual charges were very often made by persons who were already in jail. It was exceedingly common for the prisoner, arrested on the indictment or presentment of a juror to turn king's evidence and denounce his alleged accomplices. Such persons were called approvers, and sometimes earned their freedom by acting as champions in the duel by which the appealed persons sought to vindicate their innocence. * * * In 1274 the jurors of Pickering wapentake tell of an approver in York castle who appealed thirteen honest men, from whom the sheriff extorted forty shillings, while the jailer made even more by threatening the country people with similar appeals from another man in the prison. The Sheriff had these suspects completely at his mercy * * * ".

H. M. Cam, The Hundred and the Hundred Rolls, quoted in J. P. Dawson, The Development of Law and Legal Institutions, 90–91 (1968). See also II Pollock and Maitland, History of English Law, 654, 650 (2d Ed. 1911).

8. See Stat. 25 Edw. III, st. 5, c. 4 (1350); Stat. 42 Edw. III, c. 13 (1368); also Stat. 13 Edw. I, c. 13 (1285).

9. Quoted in Mr. Justice Harlan's dissent in Hurtado v. California, 110 U.S. 516, 555, 4 S.Ct. 292, 28 L.Ed. 232 (1884). Mr. Justice Harlan also repeated a portion of Erskine's defense of the Dean of St. Asaph before the judges of the King's Bench: " 'The grand jury alone could arraign him, and in their discretion might likewise finally discharge him, by throwing out the bill, with the names of all your lordships as witnesses on the back of it.' " Id. at 543, 4 S.Ct. at 295. More recently, the Supreme Court has stated that "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

10. Compare Rex v. Wilkes, 4 Burr. 2527, 2568, 98 Eng.Rep. 327, 350–1 (K.B. 1770) for the more liberal practice historically permitted in the amendment of an information. See also Fed.R.Crim.P. 7(e).

212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) and in Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The concern represented by these cases is that the indictment under which the accused is prosecuted remains the same one as brought by the grand jury, rather than becoming through "interpolation the indictment of the prosecutor, or the court." *See* 8 Moore, Federal Practice § 7.04 (Cipes ed.1970); *cf.* United States v. Cox, 342 F.2d 167, 185–196 (5th Cir. 1965).

A difficult question arises, however, in distinguishing between an amendment of the indictment and a variance from the indictment. The principles articulated by Judge Skelly Wright of the Court of Appeals for the District of Columbia are apt:

> "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1071 (1969).

The consequences of characterization in each case are serious because while a variance—which raises appraisal and double jeopardy questions—may be subject to the harmless error rule, an amendment is thought to be prejudicial per se.[11] Further, the *Stirone* case suggests that the critical inquiry concerning a variance is whether it is sufficiently substantial "to amount to a constructive amendment of the indictment." Gaither v. United States, *supra*, at 1072.

In *Stirone*, the defendant was indicted for interference with interstate commerce, namely, the importation of sand into Pennsylvania to be used in building a steel plant. At trial, evidence was introduced which also showed interference with the exportation from Pennsylvania of steel to be manufactured in the new plant. The jury was instructed that they could convict on either theory. The Supreme Court reversed the conviction, stating that the "variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." 361 U.S. at 217, 80 S.Ct. at 273.

Two years later, in Russell v. United States, the Supreme Court reversed a conviction where the indictment failed to apprise adequately the defendants of the charges against them. The Court said that:

> "[t]o allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." 369 U.S. at 770, 82 S.Ct. at 1050.

The policy expressed by the Court in *Russell* "is effectuated by preventing the prosecution from modifying the theory and evidence upon which the indictment is based." United States v. Silverman, 430 F.2d 106, 110 (2d Cir. 1970).[12]

In the present case, the record reveals that Brennan and Dello Russo appeared before the grand jury which returned the indictment. The grand jury deliberated on the facts presented to it for seventeen months before naming as co-conspirators De Cavalcante, Vastola, Annunziata and "other persons whose

---

11. 8 Moore ¶ 7.05[1]; Gaither v. United States, *supra*, 413 F.2d at 1071–1072.

12. *But compare* Kirchheimer, The Act, the Offense and Double Jeopardy, 58 Yale L.J. 513, 537–539 (1949).

names are to the Grand Jury unknown." There can be little question that either the indictment was drawn carelessly or that the grand jury did not charge that Brennan and Dello Russo—key figures in the Government's case—were co-conspirators rather than victims.[13] Our inquiry, however, is limited to "whether on its face [the indictment] presents evidence which assures us that such essential elements were presented to the [grand] jury and deliberated upon by them in returning the indictment." United States v. Silverman, *supra* at 111.

■■ Each of the cases cited above on the issue of an amendment of the indictment—from *Bain* to *Silverman*—has examined primarily whether there has been a modification of the elements of the crime from that charged by the grand jury to that presented to the petit jury. The "gist" of a conspiracy under 18 U.S.C. § 371 "is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy." United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940). The existence of an agreement, rather than the identity of those who agree, is essential to prove the crime of conspiracy. Accordingly, in United States v. Gasoline Retailers Association, Inc., 285 F.2d 688 (7th Cir. 1961), the court found no error where the grand jury knew the names of co-conspirators but did not specify all of them. The present case is somewhat different, for the inference from the indictment here is that while the grand jury knew of the existence of Brennan and Dello Russo, it did not know them

as co-conspirators. But the grand jury did assert the existence of co-conspirators other than De Cavalcante, Vastola and Annunziata. *Cf.* United States v. Gordon, 242 F.2d 122, 125 (3rd Cir. 1957). The later specification by the prosecutor of Brennan and Dello Russo did not modify any element of the crime charged. Such impermissible modification might well have occurred if the indictment could be read as excluding Brennan and Dello Russo as co-conspirators. We do not believe, however, that the indictment may fairly be read in this manner. *Cf.* United States v. Silverman, *supra*, at 112.

■ Although the circumstances of this case present a close question, we believe the addition of Brennan and Dello Russo as co-conspirators did not so change the basic theory of the alleged conspiratorial agreement as to constitute an amendment to the indictment.[14] Rather, we believe their addition constituted a variance which did not alter the crime charged, nor unfairly surprise the defendants, nor create an opportunity for the Government to prosecute the defendants again for substantially the same offense. Consequently, the naming of two more co-conspirators was not prejudicial to the defendants.

## II. EVIDENCE OF THE ALLEGED CONSPIRACY

■ The next important issue raised by the defendants is whether they were entitled to judgments of acquittal on the conspiracy count. Under the teaching of Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the prosecution must establish by substantial evidence, restricted to

---

13. We note as inapposite to the Fifth Amendment requirement that a grand jury must indict, the rule of evidence that hearsay statements of co-conspirators whether or not named in the indictment are admissible at trial, provided a conspiracy involving them is in fact established at trial. *E. g.,* United States v. Annunziato, 293 F.2d 373, 378 (2d Cir. 1961); United States v. Berger, 433 F.2d 680, 683 (2d Cir. 1970).

14. *Compare* Jeffers v. United States, 392 F.2d 749, 753 (9th Cir. 1968) with United States v. Fruchtman, 421 F.2d 1019 (6th Cir. 1970). We note, however, that the Government could not have made Brennan and Dello Russo defendants on the basis of the "persons * * * unknown" language. *See* Connor v. Picard, 434 F.2d 673 (1st Cir. 1970).

proof *aliunde*, the fact that a conspiracy existed. "Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it." United States v. Cohen, 197 F.2d 26, 29 (3rd Cir. 1954); United States v. Weber, 437 F.2d 327, (3rd Cir., 1970). These principles require that in assessing the evidence of the existence of a conspiracy and each defendant's connection with it, hearsay statements of other alleged co-conspirators (including co-defendants) must be excluded from consideration. Only when the Court finds that there is enough evidence of a conspiracy and a particular person is connected with it, may hearsay statements made by co-conspirators be used against him.[15]

We must begin our examination of the evidence with the proposition that the Government is entitled, once a jury returns a verdict of guilty, to have this Court view the evidence in the light most favorable to the prosecution in order to sustain the convictions. United States v. Weiss, 431 F.2d 1402, 1407 (10th Cir. 1970). At trial, the Government produced only Martin and Wasserman from among the victims to testify. The defendants presented no evidence. Most of the following details, therefore, come from the testimony of Martin and Wasserman, and will serve here to fill in the interstices of the factual outline given in Part I of this opinion.

During the months of August, September and October, 1966, many calls were placed between the telephones billed to De Cavalcante, Brennan and Dello Russo. The Government introduced no evidence concerning who made the calls, or what conversations occurred during the course of these calls.

Prior to September, 1966, Martin had known Brennan and Dello Russo for about two months, while Wasserman had known them for five or six months. During the five or six month period, Brennan told Wasserman that he had known De Cavalcante for over twenty years. Brennan "always told" Wasserman that De Cavalcante "was the big boss of rackets in New Jersey."[16] The Government argues that this statement helps prove the reasonableness of the fear of the victims of the extortion. However, there is no evidence that any of the other alleged victims ever heard this statement, or held a similar opinion for other reasons. We note that Brennan apparently mentioned De Cavalcante to Wasserman, both before and after the time when the alleged conspiracy began.

On September 28, 1966, the night the gamblers were robbed, Vastola and Annunziata drew their guns immediately after Smith gave the signal to the gamblers that he was about to introduce the crooked dice into the game. Vastola and Annunziata told all the others, including Brennan and Dello Russo, to remove their pants, and then took all of their money. To Coogan, Vastola said "I am surprised at you, Tom. You know a lot of good people. And I am surprised that you would rob your friends, all your good friends, just rob them the way you have been doing." Before he left, Vastola had hit Coogan and Wasserman, had threatened Smith and Martin, but said nothing to Brennan nor Dello Russo. Vastola then demanded $300 per week from the gamblers. As he and Annunziata were leaving, Vastola said to the others, "Go see who you know and see if it will do you any good," or "See who you know and see if you can get it straightened out, if you can."

The first person among the gamblers to speak after Vastola and Annunziata left was Brennan. He said, "I will call

---

15. *See* Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 987 (1959); United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969).

16. Defendants separately attack the admissibility of this statement. The trial

court relied on Carbo v. United States, 314 F.2d 718, 740–741, 742, fn. 35 (9th Cir. 1963), in permitting the testimony, and gave a limiting instruction. We do not pass on the propriety of that decision in this case.

my friend, Sam, and see if I can't get this straightened out," or he said, "I will see Sam and get it straightened out for you." Because Vastola's blow had knocked out Wasserman, the gamblers took the latter to a hospital and then met at a restaurant in Philadelphia to discuss what action to take. All agreed that Brennan should ask De Cavalcante to help them get back their money from Vastola, and settle the dispute.

Brennan arranged a meeting with De Cavalcante, and the gamblers went from Pennsylvania to see De Cavalcante at a Holiday Inn in Kenilworth, New Jersey two days later (September 30, 1966). At the Holiday Inn, De Cavalcante told Brennan, "You never bring me anything but trouble; that is all you ever bring me. When are you going to bring me something good?" Saying that he had the fellows who had robbed them, De Cavalcante told the gamblers to come back to see him later that day at his office. Present at the meeting that afternoon were De Cavalcante, Vastola and the six gamblers. Vastola declared he had a "legitimate beef" against the gamblers, that they had been cheating "his people," and that he wanted $20,000 from them. De Cavalcante calmed Vastola and told the gamblers he would try to work out a settlement with Vastola. As De Cavalcante and Vastola left the room to discuss the matter, Vastola took a ring from Smith's finger. Brennan told Smith, "He can't do this, you are in Sam's office; you are under Sam's protection. I am going out and get the ring back." Shortly thereafter, Brennan returned with the ring.

De Cavalcante then came into the room alone, and said the best "settlement" he could persuade Vastola to accept was $2,000 from each of the six gamblers. When they complained of not having that much money, he told them, "If this deal isn't satisfactory to you, you can go back and do business with him [Vastola]. As mad as this guy is, you are lucky you are not in the river." Wasserman testified that De Cavalcante said, "You fellows don't know what a break you are getting. You are lucky you are with me. If you wasn't with me you would be in the river. I am trying to get this thing straightened out for you. You are going to have to pay this." Specifically to Martin, De Cavalcante said, "You are Italian, aren't you? Then you know what happens if you don't do what you are supposed to do." Throughout the meeting, De Cavalcante treated everyone "in a gentlemanly manner."

After expressing some reluctance to accept the proposed deal, all six men finally agreed to make installment payments. But when Vastola was called into the room and informed of the "settlement" terms, he demanded cash. De Cavalcante offered to pay the money to Vastola, if the others would repay him. Since De Cavalcante already owed money to Brennan, the latter was told his $2,000 would be deducted from that debt. De Cavalcante told Dello Russo he could go to a money lender in Brooklyn for his share of the money, and that De Cavalcante would be Dello Russo's guarantee to the lender for the loan. De Cavalcante then arranged with the four other men for future payments. One such payment was made the next day, October 1st, by Martin and Smith. It is the above meeting on September 30th, and the payment on October 1st which forms the basis of the two substantive counts against De Cavalcante.

On October 26, 1966, Martin was called before the grand jury concerning the events described above. Brennan and Dello Russo visited Martin on October 27th and Brennan asked Martin whether he had invoked his fifth amendment privilege not to incriminate himself before the grand jury. When Martin replied that he had, Brennan said, "It's a good thing you did, because anybody that knows anything doesn't testify against Sam. Sam is not worried about this. It is all going to blow over. He can take care of it. He wants his money, anyway." The grand jury investigation proceeded, and at the end of November, an effort was made by Vastola

to fabricate evidence in order to protect De Cavalcante. Vastola told the gamblers that the Government was "out to get" De Cavalcante, and arranged for them to participate in the making of a film in a New York City hotel room. In the film, they said they were all good friends and that no extortion had occurred.[17]

■ The foregoing constitutes the essence of the prosecution's case, including several statements whose admissibility turns on the establishment by extrinsic substantial evidence of the existence of a conspiracy. Viewing all the evidence presented, there is not a sufficient basis upon which the jury could reasonably find a "common design" or "concerted action" proven by the Government.[18] United States v. Lester, 282 F.2d 750 (3rd Cir. 1960); United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 182 (3rd Cir. 1970). Rather, all the connecting links needed in the story to prove a conspiracy—that is, the existence of an agreement—are supplied only by the prosecution's arguments. Judge Friendly has stated the applicable principles as follows:

> "Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964).

Under this standard, there is insufficient evidence to prove an agreement by and between De Cavalcante, Vastola, Annunziata, Brennan and Dello Russo to induce the Philadelphia gamblers to travel from Pennsylvania to New Jersey for the purpose of extortion. Certainly De Cavalcante, Brennan and Dello Russo knew each other before September, 1966. But this association alone cannot convert Brennan's suggestion to the other gamblers that De Cavalcante might be able to help them in their dispute with Vastola into a conspiratorial inducement to come under De Cavalcante's power. De Cavalcante's statements during the meeting at Kenilworth would support his contention that vis-à-vis Vastola and the gamblers, he was "merely" an "arbitrator," not in conspiracy with one faction to the dispute. Vastola's statements and actions, while criminal, hardly amount to evidence showing a conspiracy. It may well be that the Government could have proven some type of unlawful conspiracy in late November, 1966 to shield De Cavalcante from the grand jury investigation, but no crime based on their theory is charged.

### III. COUNTS TWO AND THREE OF THE INDICTMENT

■ Count two of the indictment charged that De Cavalcante caused the victims to come to the initial meeting with him in New Jersey on September 30, 1966, for the purpose of extortion.[19] This count must turn on the conspiracy theory, for if Brennan, Dello Russo, Vastola and Annunziata were all in league with De Cavalcante, their actions

17. We do not here pass on the propriety of the District Court's decision to allow this film to be shown to the jury.

18. *See* generally Developments in the Law —Criminal Conspiracy, *supra*, n. 14 at 925–927, 933–935.

19. Count two charged as follows:
"On or about September 30, 1966, the defendant SAMUEL RIZZO DE CAVALCANTE did wilfully * * * cause Thomas Coogan, Morris Wasserman, Kenneth Martin and James Marion Smith to travel in interstate commerce between Trevose, Pennsylvania, and Kenilworth, in the State and District of New Jersey, with intent to * * * carry on * * * an unlawful activity, said unlawful activity being extortion * * *; and therefore the defendant SAMUEL RIZZO DE CAVALCANTE did perform * * * acts to * * * carry on * * * the said unlawful activity. All in violation of Title 18, United States Code, Sections 1951 and 2."

**1276**

could be attributable to him. But there is no evidence of any other causation regarding this trip connected with De Cavalcante. Because we have found the evidence insufficient to prove a conspiracy under count one, the actions of the alleged co-conspirators may no longer be imputed to De Cavalcante. Once the actions of the others are set aside as evidence against De Cavalcante, count two must fall for lack of proof that he caused the Philadelphia gamblers to travel between Pennsylvania and New Jersey.

■ Count three of the indictment charged that De Cavalcante caused two of the victims to travel to New Jersey to meet him on October 1, 1966, and that at this meeting, Martin and Smith paid De Cavalcante $3,000, following his instructions given at his office on the previous day.[20] The allegations of this count stand independent of counts one and two. Indeed, there is sufficient evidence in the record from which the jury could reasonably have found De Cavalcante guilty of the charge in count three. Assuming that the transaction the previous day between De Cavalcante and the gamblers amounted only to a loan, De Cavalcante could not lawfully use extortionate means to collect the loan. *Cf.* United States v. DeStafano, 429 F.2d 344 (2d Cir. 1970); United States v. Fiore, 434 F.2d 966 (1st Cir. 1970).

■ However, evidence pertaining to each count was not, and probably could not have been, segregated at the trial and in the minds of the jurors. Confusion was especially likely with respect to the intent element of the crime.[21] Section 1952 requires proof that the defendant intended to "promote, manage, establish, [or] carry on" an "unlawful activity." The unlawful activity intend-

ed, under the charge here, was extortion in violation of N.J.S.A. §§ 2A:105-3, 2A:105-4. Those sections require that the extorter make a demand under threat of injury to a person or property. *Cf.* United States v. Nardello, 393 U.S. 286, 289, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969); United States v. Hughes, 411 F.2d 461, 465 (2d Cir. 1969). At trial, the Government relied primarily upon the threats made by Vastola and statements made by Brennan to prove the elements of extortion and the reasonableness of the victims' fear.[22] Since the Government did not establish the existence of a conspiracy, the threats by Vastola and the statements by Brennan may not be attributed to De Cavalcante. We do not know whether the jury relied on such facts and statements in its consideration of count three, but the possibilities for confusion in conspiracy trials have often been described.[23] We believe the possibility that the jury relied on improper evidence in reaching its verdict on count three is sufficiently serious to require a new trial as to this count.

Accordingly, the convictions of Vastola and Annunziata under count one, and of De Cavalcante under counts one and two will be reversed. The conviction of De Cavalcante under count three will be vacated and the case remanded for a new trial.

ALDISERT, Circuit Judge (concurring).

Although I am in agreement with most of the well-reasoned opinion and with the ultimate conclusion of Judge Adams, I am persuaded that the government's amendment of the conspiracy indictment constitutes an additional ground for reversal. It is elemental that defendants

20. Count three charged exactly as did count two except for the substitution of "October 1, 1966" for "September 30, 1966."

21. See footnote 2.

22. The "big boss of the rackets in New Jersey" statement was elicited on the redirect examination of Wasserman in part

to rebut a concession Wasserman made during cross-examination that De Cavalcante treated all the gamblers "in a gentlemanly manner." See also footnote 15.

23. *See e. g.,* Justice Jackson concurring in Krulewitch v. United States, 336 U.S. 440, 445-447, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

in a federal court must be tried on the specific charge brought by the grand jury. The grand jury in this case named as co-conspirators De Cavalcante, Vastola, and Annunziata, and "other persons whose names are to the Grand Jury unknown." Brennan and Dello Russo were summoned and appeared before the grand jury. They were persons whose names were to the grand jury known, not unknown. The theory of the government's case at trial was predicated on the active participation of these two men as leading actors in star roles, not as supporting characters in the conspiracy. Without proving their active participation, the government could not have assembled the bare bones of a conspiracy.

Because Brennan and Dello Russo were known to the grand jury, they would have been named as co-conspirators by that body if the conspiracy was of the type pressed by the government at trial. Therefore, the conspiracy theory presented by the government could not have been that outlined by the grand jury when it returned the charge.