UNITED STATES of America

v.

Gaetano LICATA and Louis Anthony Fresta, Jr.

Crim. No. 73-177.

United States District Court, E. D. Pennsylvania.

Dec. 7, 1973.

11. See affidavit to petitioner's motion, pages 2–3.

Robert E. J. Curran, U. S. Atty., Stephen Stein, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Nicholas J. Nastasi, Robert F. Simone, Philadelphia, Pa., for Fresta.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Louis Anthony Fresta, Jr., was tried and found guilty by a jury on each of three counts of an indictment charging him with conspiracy to manufacture and distribute and dispense a controlled substance, 21 U.S.C. § 841(a)(1); conspiracy to import a controlled substance into the United States, 21 U.S.C. § 952(a); and aiding and abetting an individual traveling in interstate commerce in furtherance of an illicit enterprise, 18 U.S.C. §§ 2 and 1952. The defendant has filed a motion for a new trial and motion for judgment of acquittal, in which several points of error are cited in support of the respective motions. The principal contention advanced by the defendant is that the trial court committed error in permitting testimony as to the hearsay declarations of the defendant's alleged co-conspirators made in the course of and in furtherance of the conspiracy. A detailed examination of the entire record, including the briefs and memoranda submitted by the Government and defense counsel, has convinced the Court that the various grounds raised by the defendant do not constitute a sufficient basis for the granting of the relief requested. Accordingly, defendant's motions for a new trial and judgment of acquittal will be denied.

The thrust of the Government's case was that Fresta, together with Gaetano Licata [1] and two other unindicted co-conspirators [2] did combine and conspire to import into the United States from Montreal, Canada, large quantities of heroin for the purpose of distribution and sale in this country. In order to establish the existence of such conspiracy and the active participation of Fresta therein, the Government introduced the following evidence at trial:

On November 30, 1973, Judge John Morgan Davis of the United States District Court, Eastern District of Pennsylvania, signed a court order authorizing the installation of an electronic listening device ("wiretap") on the telephone registered as number (215) 923–3162, located at 904 Christian Street, Philadelphia, Pennsylvania. Pursuant to the aforesaid court order, agents of the Drug Enforcement Administration ("DEA") overheard and intercepted conversations conducted over the telephone during the period of November 30, 1972, to December 18, 1972. Various incriminating statements and conversations between Fresta and Licata and between Licata and Pasquale Falcone were overheard by the DEA Agents assigned to the investi-

---

1. Although indicted as a co-conspirator in this case, the Government was unable to bring Gaetano Licata to trial. Licata is presently serving a 25-year prison sentence in Canada for crimes committed in the furtherance of this conspiracy. The circumstances surrounding Licata's arrest and imprisonment in Canada are covered in other parts of the Court's opinion.

2. The two unindicted co-conspirators have been identified as Pasquale Falcone and Frank Dasti. Falcone and Dasti have been convicted and sentenced in the United States District Court for the District of New Jersey to prison terms of ten and twenty years, respectively, for their participation in this conspiracy. The Government alleged in the indictment that Falcone arranged for Licata to meet Dasti in Canada for the purpose of purchasing heroin from Dasti. Dasti had been under investigation by the Royal Canadian Mounted Police since 1968 as a suspected trafficker in narcotics.

gation of this case. Recordings of the conversations were played during the trial and interpreted by Agent Vincent Di Stefano of the DEA. The intercepted messages included references to such things as "a 50-piece band at $25 a head," "a tune named Lil," "brown floor tile at $.07 a block," "a four-piece group," and other obscure and secretive topics. Agent Di Stefano, the supervising agent in connection with this case, testified that the above terminology was actually code or "street talk" customarily utilized by those engaged in illicit narcotics activity in order to avoid detection by law enforcement authorities. Based on his prior experiences in the investigation of narcotic offenses and specifically from the investigation of the conspiracy in question, Agent Di Stefano further testified that "a 50-piece band at $25 a head" meant 50 kilos of heroin at $25,000 a kilo, that "a tune named Lil" was a reference to a female distributor of the controlled substance methamphetamine, and that "brown floor tile at $.07 a block" described the purchase of heroin at $700 an ounce.

Conversations between Fresta and Licata contained numerous references to "going up there," "traveling over there," and the quality of the "tile." During one conversation, Fresta stated that he intended to sell the "tile" for "$.09 a block." There was also a series of conversations in which the use by Licata of Fresta's driver's license while "up there" was discussed. Without describing in detail the content of all the conversations intercepted by the wiretap and played back at trial, suffice it to say that the conversations among the co-conspirators were replete with references to obscure, furtive, and, when viewed in conjunction with all of the surrounding circumstances, drug-related activity.

The Government produced Agent Robert Walker, also of the DEA, who testified that on December 7, 1972, he followed Licata, who was driving a 1972

Thunderbird automobile, from 904 Christian Street in Philadelphia to the Gulf and Western Building in New York City, New York.

On December 13, 1972, Licata made a second trip to the Gulf and Western Building in New York City. On this trip, he was initially followed by Agent Di Stefano, who gave way to Agent Walker as Licata proceeded north on the New Jersey Turnpike. Testimony revealed that Licata entered the Gulf and Western Building, exited the building approximately ten minutes later accompanied by Pasquale Falcone, and that the two men proceeded by automobile to the John F. Kennedy Airport in New York City.

Agent Michael Campbell of the New York Office of the DEA testified that he was stationed at the ticket counter of Air Canada Airlines when he observed Licata and Falcone approach the counter. The two men were informed that their scheduled flight to Montreal, Canada, had been canceled. At approximately 12:45 p. m. on December 13, 1972, Licata and Falcone departed the airport, entered Licata's 1972 Thunderbird, and drove back to the Gulf and Western Building.

The following day, the two men returned to the John F. Kennedy Airport and flew to Montreal, Canada, on Air Canada Flight 749, landing at Dorval International Airport. Licata's reservations on the flight were under the name Louis Fresta.

While in Montreal, Canada, Falcone and Licata met with Frank Dasti in the Smith-duPont Bar in downtown Montreal. As discussed earlier in this opinion, Dasti was under investigation at this time by the Royal Canadian Mounted Police ("RCMP") as a suspected heroin trafficker.

Later that same day, Licata and Falcone arrived back at the Dorval Airport. When asked his name by the Immigration Officer, Licata identified himself as Louis Fresta.[3] The two men boarded

3. At trial, Officer Ghislain Mercier, of the Royal Canadian Mounted Police, identified a photograph as the one he took of Licata and Falcone at the Dorval International Airport.

Flight 758 and returned to John F. Kennedy Airport.

The Government then called Agent Donn Jerri Miller of the DEA. The agent testified that on December 15, 1972, at approximately 7:30 a. m., he was stationed on the listening post of the wiretap when Licata called Fresta on the telephone and requested that the latter bring two suitcases to 904 Christian Street. After overhearing the conversation, Agent Miller proceeded to the vicinity of the 9th and Christian Streets where he observed Fresta and Licata placing the suitcases in the trunk of Licata's Thunderbird automobile.

Licata was then followed to the Franklin Square Apartments in Glendora, New Jersey. At this location, the suspect was joined by a woman later identified as Gino Russo. Licata and the woman then drove directly to New York City where agents from the New York and Newark offices of the DEA assumed the surveillance responsibilities.

The agents subsequently established surveillance at the Sheraton-Mt. Royal Hotel in Montreal, Canada, where Licata was observed entering and leaving the hotel on various occasions. Agents involved in the investigation maintained constant surveillance over Licata during his stay in Canada. On one occasion in particular, Officer O'Neal Pouliot, of the RCMP, observed Licata open the passenger side of his automobile, push forward the front seat, and arrange something on the back seat or floor of the car. Shortly thereafter, Licata and Miss Russo left the hotel in which they were staying and proceeded toward the Canada-Vermont border.

On December 18, 1972, just before the couple crossed over the border into the United States, the vehicle was intercepted by the RCMP. Twenty (20) bags of heroin concealed under the back seat were removed from the car.[4] Gaetano Licata was arrested and detained in Montreal. On his person, the Canadian police found a receipt from the Sheraton-Mt. Royal Hotel, an automobile driver's license, and a Social Security card —all under the name Louis Fresta. In addition to the heroin, two suitcases identified as belonging to Louis Fresta were found in the car.

### Admissions of Hearsay Declarations of the Defendant's Co-conspirators

■ Defendant argues that the trial court erred in permitting testimony to be given as to hearsay statements made by co-conspirators during the course of and in furtherance of the conspiracy. The law is well settled that once the prosecution establishes the existence of the conspiracy by clear and substantial evidence independent of the hearsay declarations and, further, establishes the defendant's participation therein, the hearsay statements of the co-conspirators are admissible against the defendant. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; United States v. De Cavalcante, 440 F.2d 1264, 1272 (3rd Cir. 1971); United States v. Weber, 437 F.2d 327, 336 (3rd Cir. 1970).

■ The defendant has raised the issue of the sufficiency of the evidence necessary to connect him with the conspiracy. Fresta contends that the Government must present substantial evidence of the defendant's membership in the conspiracy, exclusive of the hearsay statements, before the statements are admissible in evidence. Although both the existence of the conspiracy and the defendant's participation therein must be established by evidence independent of the hearsay, once the conspiracy is established by clear and substantial evidence, slight evidence is sufficient to connect the defendant with such conspiracy and to permit the admission of the

---

4. The Government and the defendant stipulated that the twenty polyethylene bags taken from under the back seat of Licata's vehicle on December 18 by the Canadian police contained 9.582 kilograms of heroin, which is approximately 21 pounds of heroin. Fourteen of these bags contained 100% pure heroin; one bag contained 99% pure heroin; three of these bags contained 98% pure heroin, and the remaining two were filled with 92% pure heroin.

hearsay statements of the alleged co-conspirators. United States v. De Cavalcante, *supra;* United States v. Weber, *supra*; United States v. Cohen, 197 F.2d 26, 29 (3rd Cir. 1952).

This Court is convinced that the Government established by substantial evidence, independent of the hearsay, the existence of the conspiracy to import heroin into the United States from Canada. The Government presented evidence of Licata's three vehicular excursions to New York City and the final, eventful trip to Canada which terminated abruptly when Canadian authorities intercepted the vehicle and uncovered therein twenty-one pounds of heroin. There was testimony as to Licata's association with Pasquale Falcone in connection with the two flights to Canada via Air Canada, only one of which actually resulted in a flight to Montreal, Canada. The Canadian police officer testified concerning the meeting of Licata, Falcone, and Dasti in the Montreal bar just a few days before Licata was apprehended with the heroin in his possession. The Government showed by uncontradicted evidence that Fresta furnished Licata with two suitcases, his driver's license, and Social Security card before Licata left for Canada. In addition, the fact of the frequent telephone contacts between Fresta and Licata and between Licata and Falcone (exclusive of the hearsay content of such calls) points out the close confederacy of these persons. When all the evidence is viewed in conjunction, the existence of the conspiracy is clearly established.

Similarly, the Government introduced sufficient evidence to connect Fresta to the unlawful venture. As indicated above, Fresta supplied Licata with the driver's license, Social Security card, and suitcases to enable Licata to travel in Canada. These two individuals were in each other's company and conversed over the telephone frequently during the brief period in which the events now under scrutiny occurred. Finally, certain of the incriminating statements made by Fresta over the telephone (*e. g.,* "I'm going to try to sell it for $.09"; "See

if they sing a song Lil, you know what I mean"; "I don't think the guy is going to want to go there"; "I mean, you know, how is it if my floor—I mean, is it?") are examples of Fresta's own admissible conduct indicating his involvement in the enterprise. The defendant's own conversations were, without exception, couched in terms that bordered between code and a cautious awareness that his participation could be viewed as being incriminating. For example, it is perfectly plain that the defendant's own statements in conversations in which he took part establish that at the heart of his communication with Licata was some kind of profit-making business transaction, as opposed to a social, recreational or other objective. Further, the fact that reference to a 50-piece band to play before 50,000 people at $25 a head was intended to convey information in respect to the purchase of a quantity of heroin at a certain rate per kilo is evidence in the conversation of December 2, 1972, at 5:28 p. m. where Fresta and Licata dropped their guard in respect to their code-type of conversation by referring to the alleged musical enterprise in terms of "quantity." The excerpt in question, which was a statement that Licata made to Fresta and in respect to which Fresta acceded, reads as follows:

> "They could but they don't want to because they're getting ah for that kind of *quantity* for that many people they should put out for less money for tickets." (Emphasis added.)

Also, the following excerpt between Licata and Fresta in their conversation on December 11, 1972, at 12:42 p. m., discloses the connection with the identification materials furnished by the defendant Fresta, together with an awareness of some sort of apprehension. That excerpt reads as follows:

> "LICATA: Yea. Has she got that paper work?
>
> FRESTA: Yes she got it last night yea—just went to work today.
>
> LICATA: Listen i'm (sic) going to need that oh your your things again you know.

FRESTA· Yea all right.

LICATA: Because if I have to go with this guy I already registered your name.

FRESTA: Oh all right.

LICATA: You follow me?

FRESTA: Yea

LICATA: That one day I used them . . . you know what I mean?

FRESTA: Yea

LICATA: It will be just for a day

FRESTA: Its (sic) all right, you just got to be careful.

LICATA: Yea

FRESTA: All right?

LICATA: Yea. I'll talk to you later Lou take it easy.

FRESTA: So Long, (sic) Yea."

Under the standards established by the authorities heretofore recited in this Opinion as to the extent to which the evidence must show a particular defendant's participation in the conspiracy, the Court believes that that evidence is clear, unmistakable, and well within the range to allow reception into evidence the acts and hearsay statements of the co-conspirators.

Defendant's motions for judgment of acquittal and a new trial will, therefore, be denied.