UNITED STATES of America

v.

**Nelson G. GROSS, Appellant.**

No. 74–1697.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1974.

Decided Feb. 19, 1975.

---

**8.** Since the defendant Salkeld did not appeal, the judgments against him will not be affected by this opinion.

James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Jonathan L. Goldstein, U. S. Atty., John J. Barry, Richard S. Zackin, William T. Pizzi, Asst. U. S. Attys., Newark, N. J., for appellee.

Before ALDISERT, ADAMS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Nelson G. Gross appeals from a final judgment of sentence following a jury verdict on a five-count indictment charging aiding and assisting the filing of a false and fraudulent tax return, obstruction of justice, subornation of perjury before a grand jury and two counts of conspiracy. 26 U.S.C. § 7206(2) and 18 U.S.C. §§ 1503, 1622, 371. Although appellant has presented thirteen issues for review, only certain merit discussion.

I.

Testimony was adduced at trial which, when taken in the light most favorable to the verdict winner, indicates the following: In July, 1969, Gross had a number of discussions with William Preis, president of Stop & Save Trading Stamp Corporation, pertaining to a possible $25,000 company contribution to William Cahill's gubernatorial campaign. When Preis stated that the company could not pay that much in cash, Gross proposed an "easy solution". Gross stated that if Preis agreed to make a $5,000 contribution by check, Gross would arrange to furnish Stop & Save with a bill for serv-

ices rendered. Gross told Preis that "since it would be passed through as an operating expense it would become tax deductible, and it would actually only cost you half as much". (T. 1911–12). Gross assured Preis that, if the transaction were discovered, the worst that would happen would be a disallowance of the deduction by the Internal Revenue Service. In September, 1969, pursuant to this arrangement, Preis disguised a $5,000 contribution to Cahill's campaign as a business expense, utilizing a fictitious invoice from Writers Associates.

In the winter of 1972–73, the United States Attorney's office began investigating political activities in Bergen County, New Jersey. A federal grand jury issued a subpoena to Stop & Save in March, 1973, requiring the corporation to produce all records relating to Writers Associates. Thereafter, Preis met with Gross and, displaying the invoice and the grand jury's subpoena, asked, "Where do we go from here?" (T. 1993). Gross responded that the invoice represented payment for services rendered relating to a certain demonstration against an anti-trading stamp bill which had been pending in the New Jersey Legislature. Preis then asked Gross, "Why don't I just plain tell them the facts as they are, that it was a plain contribution?" (T. 1999). Gross replied, "You can't, because if you do at this late stage of the game, you will immediately be cited for conspiracy and for fraud." (*Ibid.*). Preis, accompanied by corporate counsel Leonard Wolfram, met with the United States Attorney and one of his assistants on April 12, 1973. When shown the invoice and asked what services had been rendered, Preis responded with the contrived story about the demonstration. The government prosecutors informed Preis that they did not believe him and invited him to "rethink the whole story, . . . get . . . good outside

criminal counsel, . . . prepare to come back . . . and . . . appear before the Grand Jury . . . [and] be very careful to tell the truth . . . ." (T. 2001). Later that day Preis met Gross and recited the events that took place in the United States Attorney's office. In response to Preis' need for outside criminal counsel Gross said, "You don't have any need for outside criminal counsel because I am it . . . .. Perjury is one of the hardest criminal cases there is to prosecute and to prove, because . . . one of the ingredients and requirements of a perjury charge is to have someone get up and face you, challenge you, and claim that your statement was an out and out lie, and there is just nobody who can do that . . . .. The only ones that really know the story behind this is [sic] myself and Joe McCrane. And I happen to know that Joe McCrane is going to plead the Fifth when he comes up for his hearing, and certainly I'm not going to tell . . . .. [S]o you have nothing to worry about for perjury . . . . They have no evidence of any kind. You have nothing to worry about. You can go right back and tell that same story, and you will get off absolutely free." (T. 2008–09).

On April 17, Preis appeared before the grand jury and testified that a Stop & Save check in payment of the Writers Associates' invoice represented payment to a group of women who demonstrated at the State Capitol in Trenton, New Jersey. Preis was later indicted for making false declarations before the grand jury, 18 U.S.C. § 1623.[1] On advice of new counsel, he pleaded guilty to the indictment, and received permission to go back to the grand jury and tell the truth about his and Gross' participation in the Cahill campaign. (T. 2021–31). The indictment against Gross followed.

---

1. *False declarations before grand jury or court*

 (a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses

any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

## II.

Count V of the indictment charged Gross with "suborn[ing] . . . Preis to commit perjury, as that crime is defined in Section 1623 of Title 18," in violation of 18 U.S.C. § 1622.[2] Appellant attacks his conviction on this count on alternative grounds. He contends that Count V of the indictment must be dismissed because Congress has not made subornation to make a false declaration a crime. Alternatively, appellant takes the position that, if such subornation is a crime, the court erred in refusing to charge the time-honored "two-witness rule."

We begin our analysis with the recognition that there are distinctions between the crime of general federal perjury, 18 U.S.C. § 1621,[3] and the recently-created crime, "False declarations before grand jury or court", 18 U.S.C. § 1623.

One difference concerns "[t]he general rule in prosecutions for perjury [under § 1621] . . . that the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused set forth in the indictment as perjury." Hammer v. United States, 271 U.S. 620, 626, 46 S.Ct. 603, 604, 70 L.Ed. 1118 (1926). Weiler v. United States, 323 U.S. 606, 610, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945), reiterated the *Hammer* holding and reemphasized: "The rule has long prevailed, and no enactment in derogation of it has come to our attention. The absence of such leg-

islation indicates that it is sound and has been found satisfactory in practice."[4]

Legislation did come forward, however, in the Organized Crime Control Act of 1970, of which 18 U.S.C. § 1623 is a part, Title IV, Section 401(a), October 15, 1970, 84 Stat. 932. The Act makes it a crime for one to knowingly make "any false material declaration" before any court or grand jury of the United States. Section 1623(e) specifically provides: "Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."

The legislative history discloses: "This title [Title IV, False Declarations] is intended to facilitate Federal perjury prosecutions and establishes a new false declaration provision applicable in Federal grand jury and court proceedings. It abandons the so-called two-witness and direct evidence rule in such prosecutions and authorizes a conviction based on irreconcilably inconsistent declarations under oath . . . ." 1970 U.S.Code Cong. & Ad.News pp. 4007, 4008.

Abolition of the "two-witness rule" for prosecutions under § 1623 is not the only distinction between the two statutes. As we noted in United States v. Lardieri, 497 F.2d 317, 320 (3d Cir. 1974), rev'd in part on other grounds on rehearing before original panel, 506 F.2d 319 (3d Cir. 1974), Congress chose to provide different *mens rea* elements: "Unlike the gen-

---

**2.** *Subornation of perjury*

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both.

**3.** *Perjury generally*

Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe

to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

**4.** It is clear from both *Hammer* and *Weiler* that the Supreme Court does not consider the evidentiary rule to be of constitutional dimension; the Court merely refused to depart from "[t]he special rule which . . . is deeply rooted in the past centuries" in the "absence of . . . legislation." Weiler v. United States, *supra*, 323 U.S. at 608–10, 65 S.Ct. at 550.

eral perjury statute, § 1623 requires that a false statement be made 'knowingly,' rather than 'willfully.' " Also, in § 1623 Congress expressly limited the tribunals before which the oath is taken.

■ Realizing that the general perjury and false declaration statutes have certain differences, appellant would have us hold that, without perjury as defined in § 1621, there can be no subornation of "such perjury" under § 1622. Brief at 30. We reject this unduly narrow interpretation of the subornation statute.

■ Section 1622 provides: "Whoever procures another to commit any perjury is guilty of subornation of perjury . . .." The express language of this statute embraces the procuring of another to commit "any perjury," not just "such perjury as defined in § 1621." While it is clear that the perjury and false declaration statutes are not equivalents, it is equally clear that § 1623 is a species of perjury.[5] Indeed, as previously rehearsed, the intent of § 1623 was to "facilitate Federal *perjury* prosecutions." 1970 U.S.Code Cong. & Ad. News, *supra*, at p. 4008. Therefore, we hold that the words "any perjury" in § 1622 include the making of any false declaration under § 1623.[6]

Having disposed of appellant's statutory crime argument, we turn to his "two-witness rule"[7] contention. Appellant concedes, as he must, that Congress eliminated the two witness requirement for prosecutions under the false declaration statute, § 1623. However, he somehow believes that the crime of subornation of a false declaration, in violation of 18 U.S.C. § 1622, requires corroboration.

■ Had appellant been indicted for subornation to commit perjury under the general perjury statute, § 1621, his argument would have had force. An essential element of this crime is proof that perjury was committed; and "[t]he general rule in prosecutions for perjury is that the uncorroborated oath of one witness is not enough to establish the *falsity* of the testimony of the accused set forth in the indictment as perjury." Hammer v. United States, *supra*, 271 U.S. at 626, 46 S.Ct. at 604 (emphasis added). "To hold to the [two-witness] rule in perjury and to deny its application in subornation cases would lead to unreasonable results." *Ibid.* at 628, 46 S.Ct. at 605. Thus, *Hammer* held that the same rule of evidence must apply to both crimes—perjury and subornation of perjury.

■ But that is not this case. Here appellant was indicted for suborning Preis to make a false declaration before a grand jury. Section 1623 expressly abrogates the traditional "two-witness"

---

**5.** Congress neither amended § 1622 nor enacted a new subornation statute expressly proscribing subornation to make a false declaration when it enacted § 1623 in 1970.

**6.** The government believes that Hammer v. United States, *supra*, lays appellant's argument to rest. We disagree. *Hammer* held that the general federal perjury statute applies to federal bankruptcy proceedings. Bronston v. United States, 409 U.S. 352, 357, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). Unlike the case *sub judice*, the *Hammer* indictment did not specify whether the subornation charge was drawn under 29(b) of the Bankruptcy Act [now 18 U.S.C. § 152] or § 125 of the Criminal Code [now 18 U.S.C. § 1621]. However, the Court found the allegations of the indictment were sufficient to charge an offense under *either* the perjury statute or the Bankruptcy Act. Accordingly, the omission in the indictment was immaterial; the defend-

ant was charged with "subornation of perjury." 271 U.S. at 625. Thus, the Court in *Hammer* had no occasion to, and did not, meet the precise issue before us.

**7.** Wigmore traces the ancestry of the two-witness requirement to the "Romanesque law of Continental Europe." 7 J. Wigmore, Evidence § 2032, at 241 (3d ed. 1940). "By the end of the 1600s it was decisively settled . . . that the ecclesiastical rules about numbers of witnesses were not to be adopted into the common law. It was after that time that there arose the single common-law exception to the doctrine that one witness alone may suffice in every case, namely, the rule that *one witness, without corroborating circumstances, does not suffice* on the charge of perjury. Yet even this rule was an indirect borrowing from the civil law." *Ibid.* § 2040, at 273.

rule.[8] To deny this rule's application in § 1623 prosecutions and to require its application in false declaration, subornation prosecutions would undeniably lead to unreasonable results. Using the words of the Court in *Hammer*: "Obviously the same rule of evidence in respect of establishing the falsity of the matter alleged as [a false declaration] must apply to both." 271 U.S. at 628, 46 S.Ct. at 605.

### III.

The grand jury did not name Anthony Statile as a co-conspirator in Count I, nor did it name either Statile or Joseph McCrane as a co-conspirator in Count III. It did name McCrane as an unindicted co-conspirator in Count I. Both counts did recite that appellant and the named co-conspirators had conspired with each other "and with others."

On February 5, 1974, the government informed appellant by letter that it might offer proof that Statile was a Counts I and III co-conspirator. A letter dated February 21 notified appellant that McCrane similarly might be linked as a co-conspirator under Count III.

Selection of the jury commenced on February 26. Two and one-half days later, immediately after completion of the selection, appellant moved to require the government to disclose if in fact it was going to name Statile and McCrane as co-conspirators. After receiving an affirmative oral response from the government, appellant argued that (1) the addition of the names constituted a fatally improper amendment to the indictment and that (2) he was not accorded sufficient time to prepare his defense. The district court rejected these arguments. Appellant reasserts them before us.

■ We do not write on a clean slate on the issue of amendment or variance of an indictment. United States v. Ra-

dowitz, 507 F.2d 109 (3d Cir., 1974); United States v. Goldstein, 502 F.2d 526 (3d Cir. 1974) (in banc); United States v. Somers, 496 F.2d 723 (3d Cir.), cert. denied 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); United States v. De Cavalcante, 440 F.2d 1264 (3d Cir. 1971). We have previously reviewed the various functions of an indictment, United States v. Goldstein, *supra*, and have held that the precise inquiry is whether the change in the indictment is substantial or material, and not merely one of form. *Ibid.* 502 F.2d at 528. We conclude that the addition of Statile and McCrane "did not so change the basic theory of the alleged conspiratorial agreement as to constitute an amendment to the indictment." United States v. De Cavalcante, *supra*, 440 F.2d at 1272 (footnote omitted).

■ Appellant's claim of insufficient time to prepare his defense must be tested in terms of actual or potential prejudice.

We now dispose of the contention relating to the addition of McCrane's name. He was inexorably intertwined with the specific allegations of the Count I conspiracy and with the government's theory of the subornation charge.

■ Specifically, appellant asserts that the addition of McCrane as a Count III co-conspirator enabled the government to get into evidence the fact that McCrane had exercised his Fifth Amendment right before the grand jury. The court, in the proper exercise of its discretion, admitted the evidence, with the appropriate cautionary instructions, for the specific and limited purpose of corroborating Preis' unobjected to testimony that Gross had said: "And I happen to know that Joe McCrane is going to plead the Fifth when he comes up for his hearing . . . ." (T. 2009, 2632, 2779–81, 2863–64). Because the court did not admit this evidence under the co-conspira-

---

8. Congressional action in 1970 may be contrasted with the action of the 1911 joint Parliamentary Committee in England. Looking to a codification of English criminal law the English Committee recommended, and Parliament passed, the Perjury Act of 1911, prohibiting convictions "solely upon the evidence of one witness as to the falsity . . .." Weiler v. United States, *supra*, 323 U.S. at 610 n. 4, 65 S.Ct. at 550.

tor's exception to the hearsay rule, we fail to see how this prejudiced appellant.[9]

Without alleging any specific prejudice from the addition of Statile, appellant contends that he was somehow hamstrung in preparing his case for trial. Statile succeeded Gross as Republican Chairman of Bergen County. Jack Slavitt, a Newark lawyer, was solicited in 1970, along with others, to pay outstanding bills of appellant's campaign. He agreed to make a contribution in the amount of $1,000. Subsequently, he received a Mailmar invoice in the amount of $1,015. Mailmar was a printing company. Accompanying the invoice was a letter from Statile requesting Slavitt to send his check, which was made payable to Mailmar, directly to him at "GOP headquarters." (T. 1027). It is in the Slavitt situation that Statile's participation really surfaces. The government offered this testimony to connect co-conspirators, Statile and Gross, with the use of Mailmar to mask political contributions.

We have some difficulty in perceiving the exact thrust of appellant's argument. We do not believe that he has demonstrated, by brief or at oral argument, how the addition of Statile as a co-conspirator altered the reception of this or other evidence referring to Statile's participation.

■ Appellant received informal notice of the possible addition of Statile three weeks before trial. No motion was made by appellant before the jury was selected to determine whether the government definitely intended to add Statile. After it was determined that Statile was to be added, appellant made no motion for a continuance. *See* United States, v. Somers, *supra*, 496 F.2d at 746. Slavitt's testimony describing Statile's participation was completed on March 4; appellant did not open his defense until ten days later. *Cf. ibid.*

We conclude, therefore, that appellant did have time to react to Statile's addition and that the preparation of his defense was not adversely affected thereby.

## IV.

■ Appellant argues that the trial court abused its discretion in permitting him to be cross-examined as to his income and as to certain financial statements he had filed. We find no abuse. The government's case was built largely on the testimony of Preis, President of Stop & Save, corporate counsel Leonard Wolfram and the wealthy industrialist Bernard Striar.[10] It was one of the pillars of the Gross defense, from the opening statement to the summation, that Gross was an insignificant person, and that these powerful men could not have been influenced by him. Thus, in the opening statement of the defense, the jury was told:

> The Gross firm was only little counsel. Nelson Gross was not a mastermind here. He was a private in William Preis' army.
>
> \*　\*　\*　\*　\*　\*
>
> He [Gross] was only one in the Preis army of trying to convince legislators

---

9. We also do not believe that the court abused its discretion when it permitted the government to read into evidence the excerpt of the grand jury transcript showing that McCrane pleaded the Fifth Amendment when asked about his possible role in the issuance of "false and fictitious invoices" Because of the brevity of the excerpt introduced, because the question complained of merely provided the context in which McCrane pleaded the Fifth, and because the question made no reference to Gross himself, we do not believe that the reading of the excerpt was "inflammatory" or "prejudicial".

10. Striar testified that during a July, 1970, meeting with Slavitt and appellant, he decided to make a $2,000 contribution to appellant's 1970 senatorial campaign. He and appellant discussed the possibility of masking it as a business expense. Gross then said, "[T]his could be taken care of by Mailmar." (T. 793). Shortly after this meeting Striar's New York office received a Mailmar invoice in the amount of $2,000, which was duly paid but not charged to Striar's personal account.

that it really isn't a good thing for the State of New Jersey to pass legislation which will seriously affect trading stamps.

(T.748, 752–53).

In the government's case, Preis and Wolfram were cross-examined by Gross' counsel about their salaries, deferred income, life insurance benefits, executive incentive bonuses and stock option plans. By cross-examination, appellant developed that Grand Union, the parent company of Stop & Save, had a net worth of millions and annual sales of more than a billion dollars. Striar was also cross-examined about his finances and his company's profits.

During the summation of the defense, the jury was told:

I say to you that William Preis, the Number 3 man in this million dollar corporate complex of Grand Union, the man who by his own testimony built this Triple S blue stamp operation up from nothing in 25 years to where it is today, is the man who by his own testimony was the general in the operation to combat and stamp out legislation wherever it might crop up that would vitally affect his business.

\* \* \* \* \* \*

It defies common sense, and it's an insult to your intelligence for him to say to you that in this one sphere he deferred to Nelson Gross who concocted the idea in 1969 of a phony campaign contribution and in 1973 directed him and counseled him to lie to Mr. Goldstein and the Grand Jury.

(T. 4532–33).

It is the government's position, and we agree with it, that once the juxtaposition of financial net worths was introduced in the case, it was proper for the government to elicit testimony from Gross seeking to demonstrate that he was not so financially insignificant as he purported to be. (*See* T. 4126–28).

■■■ Upholding comparable trial strategies, this court, in United States v. Lowe, 234 F.2d 919, 922 (3d Cir.), cert. denied, 352 U.S. 838, 77 S.Ct. 59, 1 L.Ed.2d 56 (1956) (footnote omitted), speaking through Judge Goodrich, added an appropriate literary touch: "When a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the other side gives him a Rowland for his Oliver." [11]

Tangential to this issue is appellant's contention that it was plain error for the court to permit the government to cross-examine him concerning his sworn statement of receipts and expenditures filed as a 1970 candidate for the United States Senate. This statement was required by the Federal Corrupt Practices Act, 2 U.S.C. § 241 et seq.[12] Gross argues that an issue of possible violation of this act was placed before the jury on cross-examination, albeit without a timely objection being raised. The government justifies its use as a means to impeach appellant's credibility.

■■■ Gross testified on direct that he had never heard of the Mailmar Printing Company through the time of the November, 1970 election. In the Corrupt Practices Act statement, Mailmar was listed as one of the firms for which he, in October, 1970, expended funds for his campaign. This was fair game for the jury on the issue of credibility.[13] Indeed, had there been a timely objection to this

11. The government later represented that it was using appellant's 1968–72 income tax returns to tie appellant's income, largely derived from his firm's representation of sewerage authorities, with his political position. (T. 4139). Appellant's counsel objected to such use but frankly admitted that Gross had already so testified. (*Ibid.*). Indeed, the court cautioned the jury that "[t]here is no impropriety involved." (T. 4148). In light of these facts, we find no abuse here.

12. Repealed and superseded by Federal Election Campaigns Act, 2 U.S.C. § 431 et seq. Act of Feb. 7, 1972, Pub.L. 92–225.

13. The government also argues that it utilized the statement to refute the Gross-created impression that he was naive when it came to campaign financing. We have reviewed the record in this light and do not believe that the statement was used for this purpose.

particular use of the statement, we believe that the court would have properly exercised its discretion if it had admitted it. As to this issue the probative value óf the testimony outweighed any accompanying prejudice.

■ We are less certain of the purpose and propriety of using the statement as a foundation for the questions concerning the amount of monies received during the campaign from various sources, the number of additional campaign accounts that Gross had, and Gross' knowledge or expenditures by the various campaign accounts in his behalf. These questions surrounded the Mailmar inquiry. Because we are of the view that the use of the statement as to Mailmar would have been a proper exercise of discretion, we do not believe that these few additional questions, in the absence of a timely objection, were so prejudicial as to require a new trial.

Appellant argues that the Assistant United States Attorney went far beyond the bounds of permissible closing argument and disclosed the real purpose of admitting the sworn statement—that appellant violated the Federal Corrupt Practices Act. The prosecutor said:

> Why do we bring out the conflict—the senatorial campaign statement? Because it is eloquent testimony to the way this defendant views the laws of the United States.

(T. 4826). Immediately following this question and representation, the prosecutor went on to say:

> It is eloquent testimony to what he considers an oath to be, and the oath I'm going to read you concerns just the expenditures because that really is the important part of this document.
>
> \* \* \* \* \* \*
>
> The important part of this document that was sworn to, signed and subscribed to, read as he himself told you,

and read carefully, was, Number 1, Mailmar. He denied ever knowing Mailmar.

(T. 4826–27).

Referring to an unreported campaign contribution by appellant's law partnership, the Assistant United States Attorney added:

> •That was a direct contribution that had to be reported under the laws of the United States, even then.

(T. 4827). Shortly afterward, in referring to appellant's statement on cross-examination that he had "avoided" the Corrupt Practices Act, the Assistant United States Attorney concluded:

> Nelson Gross, to sum it up in his own words, avoids the law, he violates the law, he is guilty of the crime charged beyond any reasonable doubt in this case.

(T. 4828–29).

These remarks seem to us to go beyond merely attacking appellant's credibility through comment on how he viewed an oath, and appear to constitute an argument that appellant's alleged violation of the Corrupt Practices Act was a matter which the jury could consider in determining the guilt. or innocence on the crimes charged. The last statement quoted above is particularly troublesome, because it seems to twist Gross' statement that he "avoided" the Act into an admission that he had violated it,[14] and to make further implication that he is therefore guilty of the crime charged.

■ Defense counsel failed to object at the time these statements were made; consequently, we can reverse only if the statements constituted plain error. United States v. Somers, *supra*, 496 F.2d at 742. We have concluded that they did not constitute plain error. Nevertheless, we unhesitatingly reaffirm Judge Garth's recent admonitions in United States v. Somers, *supra.*

---

14. When Gross was asked whether the Act was "violated", he specifically denied that it had been and stated instead that it was "avoided". (T. 4093). Gross testified and his counsel argued that it was not a violation of the Act to fail to report contributions filed by local committees operating solely within one state (T. 4091, 4105–06), and the trial judge so charged the jury. (T. 4894).

**920**

## V.

The remaining contentions raised by appellant may be discussed more briefly. We find no error in the trial judge's charge that Grand Union Company had made no attempt to deceive the IRS concerning other campaign contributions. It is apparent from the context of that portion of the charge that the trial judge was referring to attempts to deceive the Internal Revenue Service by the use of a false invoice, and there was, in fact, no evidence that false invoices were employed to disguise those other contributions. Furthermore, we agree with the government that Preis' possible role in deducting the other contributions was not really relevant, since it was clear that Preis used someone from outside Grand Union to obtain a Writers Associates invoice to make possible the deduction of the $5,000 contribution at issue. The only real dispute at trial was whether that outside person was Gross or someone else.

 Little more need be added. We reject appellant's contention that his conviction must be set aside because of the prosecution's alleged knowing reliance on perjured testimony. Appellant's characterization of Wolfram's testimony as "perjured" is nothing more than a characterization, and there is no evidence to show that the government knew that Wolfram's testimony was inaccurate or "substantially misleading". *Cf.* United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974). As to further allegations of prosecutorial misconduct, we accept the exhaustive analysis of Judge Whipple in his opinion denying a new trial. 375 F.Supp. 971 (D.N.J.1974).

We have reviewed the testimony and are satisfied that there was sufficient evidence to support the convictions.[15] We have considered the other contentions raised by appellant and find them devoid of merit.[16]

The judgment of the district court will be affirmed.

---

15. Appellant's numerous contentions challenging the sufficiency of the evidence relate merely to the credibility of Preis and Wolfram, which we cannot evaluate for ourselves on appeal. Where the jury has returned a verdict of guilty, an appellate court is bound to accept the evidence in the light most favorable to the prosecution. *See* United States v. De Cavalcante, *supra.*

16. Other contentions are: the admission of co-conspiratorial hearsay was in error and the charge to the jury compounded the error; the

court's lack of an evenhanded policy during discovery violated substantial and constitutional rights of the defendant; the defendant was deprived of his constitutional right to a fair and impartial jury; the indictment should have been dismissed on the ground of selective prosecution and discovery should have been permitted with respect thereto; direct political contributions are deductible for tax purposes as ordinary and necessary business expenses, and therefore the indictment should have been dismissed or at least discovery permitted with respect thereto.