**UNITED STATES of America, Plaintiff,**

v.

**Nelson G. GROSS, Defendant.**

**Crim. No. 324–73.**

United States District Court,
D. New Jersey.

Feb. 23, 1978.

Robert J. Del Tufo, U. S. Atty., William W. Robertson, First Asst. U. S. Atty., Maryanne T. Desmond, Chief, Appeals Div., Asst. U. S. Atty., Jeffrey Speiser, Sp. Atty., Newark, N. J., for the Government.

Kimmelman, Wolff & Samson, Irwin I. Kimmelman, West Orange, N. J., for Nelson G. Gross.

## OPINION

WHIPPLE, Chief Judge.

This matter is before the Court on defendant's motion for a new trial pursuant to Rule 33, Fed.R.Crim.P., or alternatively, for an order setting aside the verdict by granting defendant's petition for a Writ of Error Coram Nobis. Concomitantly, the defendant seeks the right to investigate and interview the members of the *Gross* jury, and to have this Court conduct a full evidentiary hearing into alleged juror misconduct during the pendency of the trial. Defendant's application is based almost entirely on the allegations of one Leon H. Stacey, a former Deputy United States Marshal. This Court, having had the benefit of argument on the cause, as well as having carefully considered the various legal memoranda submitted by the parties, and reviewing the testimony presented, is of the opinion that defendant's claim for relief must be denied, as defendant has shown no basis in fact or law to support granting the relief sought.

## A STATEMENT OF THE FACTS UNDERLYING THIS CLAIM FOR RELIEF

On March 29, 1974, (following a four week trial), a jury of twelve men and women returned a verdict of guilty to all counts of the five count indictment against Nelson Gross. The defendant was found guilty of conspiracy to defraud the United States, aiding and assisting the filing of a false income tax return, obstruction of justice, and subornation of perjury. *United States v. Gross*, 375 F.Supp. 971 (D.N.J.1974), aff'd, 511 F.2d 910 (3rd Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). Due to the highly publicized nature of the case, the jury had been sequestered during the entire pendency of the trial.[1]

In June of 1974, the defendant was sentenced pursuant to 18 U.S.C. § 4208(a)(2) to a term of imprisonment of two years, and was fined an aggregate of $10,000. *United States v. Gross, supra.*

In November of 1975, the defendant filed a motion pursuant to Rule 35, Fed.R. Crim.P., seeking a reduction of the sentence theretofore imposed. By order of this Court filed May 13, 1976, defendant's motion was denied. Subsequently, on June 10, 1976, he renewed his Rule 35 motion, and sought alternative relief pursuant to 28 U.S.C. § 2255, claiming that the original sentence was illegal. On September 23, 1976, this Court reassessed that portion of Mr. Gross' sentence involving incarceration and reduced the term of imprisonment to one year and one day.

In conformity with present Parole Guidelines, the defendant was released from federal custody on December 10, 1976, having served five months of his sentence. On June 1, 1977, Mr. Gross' period of supervision on parole was terminated.

## FACTUAL BASES FOR THE PRESENT MOTION

Nelson Gross alleges that he first became aware of purported juror misconduct during the pendency of his trial when he was contacted by former Deputy Marshal Leon Stacey. A meeting was subsequently arranged between Nelson Gross, his father, Mr. Albert Gross, and Mr. Stacey, at which time the substance of the allegations was developed. The motion presently under consideration is a direct result of the meeting between the Gross' and Mr. Stacey.

The affidavit of former Deputy Marshal Leon Stacey was submitted in support of the motion for a new trial. Mr. Stacey was employed by the United States Marshal Service from 1971 through 1976, at which time he tendered his resignation. Throughout the course of his employment as a Deputy Marshal, Mr. Stacey was assigned to the Newark, New Jersey office.

Mr. Stacey alleges that during the first week of the *Gross* trial, he was assigned to

---

1. The sequestration order was signed by the Honorable Lawrence A. Whipple, who presided at the trial.

guard the sequestered jurors, and that he continued on this duty for approximately three weeks thereafter. (Stacey aff., para. 4). Mr. Stacey contends that he was at the duty site[2] from 7:00 a. m. to 7:00 p. m., seven days a week. It was during this assignment at the Coachman Inn that Mr. Stacey purportedly developed a close personal relationship with one of the female jurors.[3] The affiant further alleged, that in addition to private trysts with the juror at the motel site, the relationship was also fostered during frequent court house rendezvous during the last ten days of the *Gross* trial. (Stacey aff., para. 8).

Lastly, Mr. Stacey maintained that Deputy Marshals Cosmo Alagna and Samuel Cicchino also participated in these court house and motel meetings, as they had become friendly with another female juror serving on the *Gross* trial. The affiant states that the relationships developed during the trial continued on at least two post-trial occasions. In support of this allegation, Mr. Stacey alleges that he hosted a Saturday afternoon party with the two female jurors and Deputy Marshal Cicchino at his apartment in Carteret, New Jersey. The illicit relations alluded to in Mr. Stacey's affidavit purportedly occurred at this time.[4]

The motion presently before this Court was filed by Nelson Gross in sole reliance on the allegations of Mr. Stacey as recounted during a motel meeting between Leon Stacey, Nelson Gross and Albert Gross.

At the initial hearing on the cause,[5] the government stated that in order to determine the truth of the allegations upon which this motion is based, it was amenable to a limited hearing, wherein Mr. Stacey

would be called to testify. However, at that time, the government specifically reserved its right to challenge the jurisdictional basis of the proceeding.[6] Recognizing its inherent duty to protect and uphold the integrity of the judicial process, and fully aware of the gravity and potential import of Mr. Stacey's allegations, this Court determined that an *in camera* proceeding was required. However, the Court ruled that this hearing would initially be limited to a judicial inquiry into the veracity of Mr. Stacey's allegations.

Following a complete examination of the affiant, Leon Stacey, the government moved to dismiss, maintaining that this Court lacks the requisite jurisdiction to grant the requested relief. Alternatively, the government seeks dismissal on the grounds that there is no credible evidence to justify further proceedings in this matter. As the government's motion is directly related to the substance of Mr. Gross' motion for new trial, the Court's ruling is equally applicable to all motions pending before it.

## ALTHOUGH NOT ALL AVENUES OF REVIEW ARE AVAILABLE TO THIS DEFENDANT, THIS COURT DOES HAVE JURISDICTION OVER THE MATTER

### A Petition for a Writ of Error Coram Nobis Is a Proper Procedure to Obtain the Requested Relief

 The Writ of Error Coram Nobis was designed to provide a vehicle whereby the courts can rectify a potential injustice

---

2. Mr. Stacey was assigned to guard that portion of the Coachman Inn in Cranford, New Jersey where the sequestered jurors were lodged.

3. This Court is eminently aware that the allegations of interference with the sanctity of the jurors' oath has far-reaching ramifications which can adversely affect the private lives of many innocent jurors. Conscious of a responsibility to both the moving party and the jurors, this Court determined that the judicial inquiry into the veracity of the allegations must be held *in camera*. Additionally, no juror will be

named in this opinion, as this Court feels that they are entitled to privacy and not have their names bandied about through allegations of misconduct.

4. Stacey affidavit, para. 20.

5. *The initial return date of the motion was* December 27, 1977.

6. The Court's order directing that a hearing be undertaken also expressly preserved the government's jurisdictional argument.

caused by an error in fact which rendered the initial proceeding irregular and invalid. *United States v. Cariola,* 323 F.2d 180, 184 (3d Cir. 1963). In practical effect, the writ is rarely utilized in federal courts and the burden rests on the petitioner to show that a factual error existed such that, if known, would likely have achieved a contrary result. However, the Supreme Court has determined that by virtue of the all writs statute, 28 U.S.C. § 1651, the federal courts are empowered with the requisite jurisdiction to grant relief in the nature of coram nobis. *United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 98 L.Ed. 248 (1954).

■ In the instant case, Mr. Nelson Gross is no longer in federal custody. Consequently, he is unable to invoke the provisions of 28 U.S.C. § 2255. *Parker v. Ellis,* 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960). Thus, when the petitioner is no longer incarcerated, the proper vehicle to attack an improper conviction is the writ of error coram nobis. *United States v. Russo,* 358 F.Supp. 436 (D.N.J.1973); *United States v. National Dairy Products Corp.,* 313 F.Supp. 534 (W.D.Mo.1970).

■ In order to establish a right to coram nobis relief, the defendant must allege, on the face of the petition, facts sufficient to show that an error of a fundamental nature existed, which factual error rendered the prior proceeding irregular or invalid. Additionally, the defendant bears the burden of showing that coram nobis relief is required in the interests of justice. *Tinkoff v. United States,* 129 F.2d 21, 23 (7th Cir. 1942); *United States v. Russo, supra.* Successful petitions for issuance of a writ of error coram nobis have involved such fundamental defects as deprivation of counsel and the inability of a defendant to exercise his fifth amendment privilege against self incrimination. *United States v. Morgan, supra; United States v. Russo, supra.*

■ If true, the allegations upon which the present motion is found present factual matters which conceivably may have affected the outcome of the trial. Therefore, it is the considered opinion of this Court that the alleged misconduct is of such a grave and fundamental nature that the initial proceeding may have been tainted. In arriving at this decision, this Court is mindful of a Supreme Court decision which held that juror misconduct is not the type of fundamental error which necessitates issuance of the writ. *United States v. Mayer,* 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914).[7] However, *Mayer* is distinguishable in that it dealt with a situation wherein a juror allegedly lied and concealed a bias against the defendant during the course of voir dire examination. By contrast, the instant case involves possible prejudicial communications and contact with an officer of the Court. Accordingly, *Mayer* is not controlling, and this Court is empowered with the requisite jurisdiction to determine whether the factual allegations warrant issuance of the writ.

*This Court is Jurisdictionally Barred From Providing the Relief Sought Pursuant to Rule 33, Fed.R.Crim.P., Motion for New Trial*

Rule 33 provides that a motion for new trial based on newly discovered evidence must be made within two years of the entry of final judgment. The federal courts have defined final judgment as the date of issuance of the mandate of affirmance by the appellate court. *United States v. Granza,* 427 F.2d 184 (5th Cir. 1970); *Casias v. United States,* 337 F.2d 354 (10th Cir. 1964).

■ In the instant case, the Third Circuit Court of Appeals issued its mandate of affirmance on November 10, 1975, which affirmance was docketed on November 14, 1975. The present petition was filed on December 5, 1977, more than two years following the issuance and docketing of the

---

7. Although the Court indicated that it would not decide whether there was the requisite jurisdiction, it considered the merits of the case and determined that coram nobis was unavailable even if jurisdictionally permissible. *United States v. Mayer, supra,* 235 U.S. at 69, 35 S.Ct. 16.

affirmance. Therefore, on the face of the pleadings, it appears that the Court is jurisdictionally barred from granting the petition. However, the defendant maintains that the two year limitation only began to run upon issuance of the last appellate affirmance. As such, defendant contends that the two year limitation was tolled until May 28, 1976, the date on which the Third Circuit filed a judgment in lieu of mandate affirming the District Court's denial of defendant's motion for new trial. Defendant's interpretation of Rule 33 is clearly erroneous. Indeed, a contrary ruling would completely abrogate the concept of finality as intended by the framers of Rule 33. *See Clark v. United States,* 370 F.Supp. 92 (W.D.Pa.), *aff'd,* 506 F.2d 1050 (3d Cir. 1974); *Smith v. United States,* 109 U.S.App. D.C. 28, 283 F.2d 607 (1960), *cert. denied,* 364 U.S. 938, 81 S.Ct. 387, 5 L.Ed.2d 369 (1961).[8]

## BEFORE ·ADDRESSING THE MERITS OF THIS CASE, CERTAIN LEGAL PRESUMPTIONS MUST BE SET FORTH

■ A legal proceeding is presumed regular; and consequently, the assailant bears the burden of proof to the contrary. *United States v. Cariola, supra* at 184. The presumption of regularity is well recognized in the federal courts, and has been considered in ruling on the merits of the petition. *See Ybarra v. United States,* 461 F.2d 1195 (9th Cir. 1972); *Bruno v. United States,* 474 F.2d 1261 (8th Cir. 1973); *Peterson v. Missouri,* 355 F.Supp. 1371 (W.D.Mo. 1973). Thus, in applying for a writ of error coram nobis, the petitioner herein must show, on the face of the pleadings, that 'an error in fact of a fundamental nature existed at the prior trial. The burden extends to a showing that, if known, the verdict may

very possibly be contrary to the verdict actually rendered.

■ While the defendant thus bears the burden of overcoming the presumption of regularity in the original trial, a conflicting presumption weighs heavily in his favor. Specifically, where there is alleged juror-third-party contact on matters germane to the issue before the court, a presumption of prejudice arises and the Court must thereafter conduct a hearing to determine whether the alleged misconduct occurred. *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. McKinney,* 429 F.2d 1019, 1025 (5th Cir.), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1970). Pursuant to its judicial obligation, this Court conducted an *in camera* hearing, at which time Mr. Stacey was examined by all parties to the proceeding.

## DISPOSITION OF THE MATTER PENDING BEFORE THIS COURT

In order to test the veracity of the allegations set forth in Mr. Stacey's affidavit, an evidentiary hearing commenced on December 27, 1977. The hearing was continued on January 10th through 13th, 1978 and concluded on January 16, 1978.

During the course of the hearing, counsels for the petitioner and the government were afforded extensive opportunity to examine former Deputy Marshal Leon Stacey. Mr. Edward P. Sheu,[9] the present United States Marshal for the District of New Jersey testified as to the records and logs in the custody of the United States Marshal. Additionally, Miss Ronna Paul, a stenographer employed by Nelson Gross, testified as to the preparation of the affidavit which resulted from the meeting between Leon Stacey, Nelson Gross and Albert Gross.[10]

---

8. This Court has already established that it is vested with the requisite jurisdiction to determine the instant motion, and to grant any relief it deems warranted. Therefore, a finding of lack of jurisdiction to determine the Rule 33 application is of no real consequence.

9. Marshal Sheu was not the United States Marshal for the District of New Jersey at the time this misconduct allegedly occurred.

10. Miss Paul was employed by Nelson Gross to accompany him to the motel meeting with Mr. Stacey, to take stenographic notes as dictated during that meeting, and to transcribe those notes. Miss Paul was also present on the

Having carefully considered all the testimony adduced at the hearing, this Court is of the opinion that there is no credibility to the allegations of misconduct, and therefore, no legal bases to warrant issuance of the writ of error coram nobis. So that this ruling may be clear on all material points, this Court will particularize the facts which led to the rendition of this ruling.

## THE MANNER IN WHICH LEON STACEY'S AFFIDAVIT WAS PREPARED RAISES SERIOUS DOUBTS AS TO ITS CREDIBILITY

During the fall of 1977, Mr. Leon Stacey contacted Mr. Nelson Gross stating that he had evidence concerning irregularities during the pendency of the *Gross* trial. Mr. Nelson Gross thereupon arranged to have Mr. Stacey return to New Jersey from his residence in California, and a meeting was arranged. On November 10, 1977, Mr. Stacey did in fact meet with Nelson Gross and his father, Albert Gross, at the Holiday Inn in Carteret, New Jersey. Miss Ronna Paul, a stenographer employed by Nelson Gross, also accompanied Mr. Nelson Gross to this meeting. It was pursuant to this two day meeting that the present petition arose.

When questioned, Mr. Stacey admitted that the carefully chosen wording of the affidavit was primarily the creation of Mr. Nelson Gross. (T. pp. 241, 251–53, 255, 406–07). Although Mr. Stacey claims that all of the statements contained in the affidavit are true, it must be noted that this document was prepared over a two day period, and several statements were incorporated into the affidavit which were not dictated by Mr. Stacey.[11] It must also be noted that Mr. Stacey was unable to recall the name of the juror with whom he allegedly became friendly, and therefore her name did not appear in the affidavit as originally drafted. In fact, testimony adduced from both

Mr. Stacey and Miss Paul developed that Mr. Nelson Gross supplied the name of the juror, and Mr. Stacey confirmed that this was the juror in question. (T. pp. 255–56, 431–33).

Accordingly, this Court finds that the manner in which this affidavit was prepared raises serious doubts as to its veracity and credibility.

## MR. STACEY'S MOTIVES ARE NOT ENTIRELY HONORABLE, AND HIS ACTIONS ARE THUS IMPUGNED

On its face, Mr. Stacey's affidavit raised serious material questions of fact. In view of the gravity of the situation, this Court ordered that a hearing be conducted so that the affiant could be interrogated, thereby enabling this Court to determine whether there was sufficient factual bases to warrant a more extensive hearing.

During the course of this hearing, it became apparent that Mr. Stacey may have personal motives to fabricate a story, thereby drawing public attention to him, and aiding him in his quest for personal recognition. In this regard, it must be noted that Mr. Stacey is the subject of a book presently being written by Mr. Tom Renner. (T. p. 231). The novel, entitled "Deputy with the Tarnished Badge", centers around Leon Stacey's activities as a Deputy United States Marshal. (T. pp. 231, 356). It was allegedly at the urging of the author that Mr. Stacey revealed the purported improprieties which occurred during the *Gross* trial. The author was also instrumental in publishing a magazine story alluding to misconduct throughout the Marshal's service. This article was admittedly published in an effort to gauge public reaction to the news of misconduct during the *Gross* trial. (T. pp. 231–34). Mr. Stacey has also been contacted by various television personali-

---

second meeting day, at which time the affidavit was finalized and signed by Mr. Stacey. Miss Paul's stenographic notes were transcribed and read into the record, thereby providing a basis for comparison of the matters dictated and the end product of the moving affidavit.

11. For further explanation of this point, compare:

Stacey aff. 9 with Ex. 2A, page 7
Stacey aff. 12 with Ex. 2A, page 9
Stacey aff. 13 with Ex. 2A, page 10
Stacey aff. 14 with Ex. 2A, page 12

ties, and there is some indication that he may make television appearances. (T. pp. 356–58, 380). Thus, it is eminently clear that continued public attention will financially benefit Mr. Stacey.

Further, although Mr. Stacey claims that he bears no ill will toward the Deputy Marshals he has implicated in this wrong-doing, his testimony belies this contention. (T. p. 34). Indeed, Mr. Stacey admits that Marshal Hirschman, Mr. Stacey's immediate superior during the *Gross* trial, recommended that Mr. Stacey be suspended from duty with the United States Marshals. He further acknowledged that Deputy Marshal Cicchino testified against Mr. Stacey in a disciplinary proceeding, and that after resigning from the Marshal's service, his subsequent application for reinstatement was denied. (See T. p. 338; Gov't Ex. 35). Mr. Stacey's credibility is further impugned by the existence of disciplinary reports, which records depict Mr. Stacey as an erratic, unstable person in serious need of psychiatric help. (T. pp. 731–32; Gov't Ex. 35).

The record before this Court is replete with contradictions and discrepancies in Mr. Stacey's testimony. Additionally, several of Mr. Stacey's allegations are inherently unbelievable. The evidence presented to this Court evinces a strong incentive on Mr. Stacey's part to fabricate this story. Lastly, the manner in which the affidavit was prepared casts serious doubts as to its credibility and veracity. Having carefully considered all the testimony adduced at the hearing, this Court is of the opinion that Mr. Stacey is not a credible witness, and his allegations as to all material aspects are false.

## THE ALLEGATIONS CONCERNING MOTEL SITE TRYSTS TOTALLY LACK CREDIBILITY

In his affidavit, Mr. Stacey alleges that during the *Gross* trial, he was assigned to supervise and guard the sequestered jurors at their motel quarters on the third floor of the Coachman Inn in Cranford, New Jersey.

According to Mr. Stacey, his duties as the day Deputy Marshal at the motel site extended approximately three weeks. (Stacey aff., para. 4; T. p. 62, 83). During the course of questioning, Mr. Stacey stated that his duty hours were from 7:00 a. m. to 7:00 p. m., seven days a week, and that his main obligation was to guard the motel site when the jurors were in court. (T. pp. 62, 68).

Mr. Stacey claims that approximately four or five days after being assigned to guard the motel site, Deputy Marshals Cicchino and Alagna informed Mr. Stacey that a certain female juror was sexually attracted to him. (Stacey aff., par. 6; T. pp. 75–76). Thereafter, he was formally introduced to the young woman, and alleges that they began to develop a personal relationship. (T. pp. 77, 81). Mr. Stacey claims that Deputy Marshals Cicchino and Alagna often met with another female juror, both privately, and in his company. The witness testified that his relationship with the young female juror continued through the second week of trial, at which time they purportedly went for walks at the motel site.[12] According to Mr. Stacey, it was during the first such walk that he allegedly kissed the young woman. (T. pp. 124–45, 130–36).

Mr. Stacey further asserted that he was able to form a more personal relationship with the young juror at a "secluded hideaway" at the motel site. (T. pp. 107–08). The affiant described this hideaway as a private area, where music sessions and refreshments were enjoyed by Deputy Marshals Stacey, Cicchino and Alagna, and the two young jurors, and where he allegedly shared kisses and caresses with the young juror. (Stacey aff., para. 13). Lastly, Mr. Stacey alleges that during these "parties" in the "secluded hideaway", the two female jurors repeatedly expressed their desire to have the trial reach a speedy conclusion. (Stacey aff., par. 13).

---

12. Mr. Stacey claimed that Deputy Marshals Cicchino and Alagna, as well as the second female juror, often accompanied them on these private walks. (T. pp. 124–25, 130–36).

During the course of his testimony, Mr. Stacey attempted to clarify the specific times and places surrounding the alleged improprieties. During direct examination, Mr. Stacey claimed that the first private party with the two female jurors occurred the Saturday immediately following the commencement of the trial. (T. p. 105). This party purportedly took place at the secluded hideaway, which was described as an area on the third floor of the Coachman Inn, which area was not visible from either the jurors' recreation room or the command station manned by Deputy Marshals. (T. p. 103). Mr. Stacey further maintains that a record player was brought to the secluded hideaway on a specific rainy Saturday afternoon, and that Deputy Marshals Stacey, Cicchino and Alagna spent the entire afternoon in the company of the two jurors, dancing and enjoying the music. (T. pp. 116–23). The witness also claims to have kissed and have had physical contact with the young woman during this rainy Saturday afternoon. (T. pp. 147–48).

Mr. Stacey's credibility was seriously impugned by the introduction of the Marshal's Master Log and Mr. Stacey's personal time logs into evidence. (See Gov't Ex. 4–34). The Master Log Book is a record keeping device wherein the activities of all Deputy Marshals are docketed. (T. p. 293). During his tenure as a Deputy Marshal, Mr. Stacey also kept personal daily records, which he claims were conscientiously and diligently maintained. (T. pp. 62, 126, 257, 293, 523–25, 553, 556–57).

Although Mr. Stacey maintained throughout this investigation that he was assigned to the Coachman Inn for at least two weeks, his personal logs belie this allegation. Indeed, Mr. Stacey's records reveal that he was assigned to guard the motel site for only one week—March 3 through

March 9, 1974. The Master Log corresponds accordingly.

Mr. Stacey also alleged that he arrived at the duty site at 7:00 a. m. and often met with the female juror between 7:00 a. m. and 7:30 a. m. (T. pp. 258–59). By contrast, the Master Log indicated that Mr. Stacey arrived at the duty station at 8:00 a. m., and Mr. Stacey's personal records reflect that he never arrived earlier than 7:45 a. m. Thus, the existence of any early morning meetings between Mr. Stacey and the juror is seriously impugned.

Additionally, although Mr. Stacey testified quite extensively as to a rainy Saturday at the motel site, (T. pp. 116–23) this testimony was later recanted. (T. pp. 612–13). Indeed, it was only upon being confronted with the log books that Mr. Stacey admitted that the jury was away from the site on all-day bus trips on both Saturdays Mr. Stacey served at the motel site. (T. pp. 612–13).

Lastly, although Mr. Stacey continually asserted that the Master Log would corroborate the fact that he had taken numerous walks with the juror, the Master Logs are curiously silent on this point. (T. pp. 282, 288, 291–93, 600–01).

In an effort to establish the truth of Mr. Stacey's statements concerning the motel site, this Court conducted a physical examination of the area wherein the jury was sequestered.[13] The physical examination of the motel site adduced the following facts:

—the "secluded hideaway" is directly opposite one entrance to the recreation room, which entry door always remained open; (T. p. 730)

—ingress and egress from the recreation room necessitating passing the hallway where the parties allegedly occurred; (T. p. 723)

---

13. The Court's inspection was conducted in the presence of the following individuals:

Honorable Lawrence A. Whipple, presiding
Mr. Robert J. Del Tufo, United States Attorney
Mr. William Robertson, First Assistant, United States Attorney
Mr. Jeffrey Speiser, Special Attorney, (Justice Department)
Mr. Irwin Kimmelman, the petitioner's attorney
Mr. Nelson Gross, the petitioner
Mr. Albert Gross, the petitioner's father
Mr. Leon Stacey, the witness
Mr. David Ruhnke, Federal Public Defender

—the "hideaway" is located approximately two and one-half feet from the nearest living quarter; (T. p. 726)

—the "hideaway" is in actuality a hallway between an entryway to the motel and the corridor to the living quarters.

Thus, it is clear that the physical lay-out of the "secluded hideaway" belie usage of that terminology.

Accordingly, I find that this area was not a "secluded hideaway" but, in reality, a public corridor, easily viewed by persons in the recreation room, or anyone passing through the common hallways on their way to or from the living quarters. (T. pp. 722–24). Additionally, the Court finds that there is no credibility to Mr. Stacey's allegations, and the purported improprieties cannot have occurred.

## THE ALLEGATIONS CONCERNING THE SMITHVILLE TRIP ALSO LACK CREDIBILITY AND CANNOT BE BELIEVED

During the course of direct examination, Mr. Stacey alleged that he accompanied the jurors on a bus trip to Smithville, New Jersey. It was allegedly during this outing that he told the female juror that, due to his political affiliations, Nelson Gross would receive only a slap on the wrist if convicted. (T. pp. 177–78). This communication constitutes the first instance wherein Mr. Stacey claims to have discussed the trial with the young woman.

If true, this communication would indeed be serious evidence of a jury taint. However, the evidence adduced at the hearing leads this Court to the conclusion that Mr. Stacey's claims are untrue. Indeed, Mr. Stacey was impeached through his own testimony. Specifically, during the course of direct examination, Mr. Stacey claimed that he sat next to the female juror during the bus trip, and further alleged that they conversed solely about their respective family affairs. He specifically stated that the trial was *not* discussed at that time. (T. p. 172). It was only after luncheon recess reflections that Mr. Stacey "remembered" the alleged conversation about the trial, and thereafter

testified to that effect. (T. pp. 177–78). It is interesting to note that such a critical allegation was not included in Mr. Stacey's affidavit. When questioned about this omission, he explained that he simply "forgot to tell" Mr. Gross about this incident. (T. p. 365). This last minute remembrance is also contrary to Mr. Stacey's representation to this Court during the first day of testimony, wherein he stated that all trial related conversations occurred in the courthouse building. (T. p. 83). Lastly, Mr. Stacey's personal logs establish that he did not accompany the jury to Smithville. (T. pp. 580–81, 617–18; Gov't Ex. 23).

Accordingly, this Court is of the opinion that Mr. Stacey's alleged conversation was conveniently "remembered" in a last minute effort to establish some credibility, and as such, lacks any basis in fact.

## IT IS MOST IMPROBABLE THAT MR. STACEY EVER MET WITH THE JUROR AT THE COURTHOUSE

Mr. Stacey claims that he often met with the female juror at the courthouse during the last ten days of the *Gross* trial. (Stacey aff., para. 8, 9, 12; T. pp. 164–65). Allegedly, the courthouse meeting sites were either in the corridor behind the courtroom, or in the stairwell and adjacent hallway leading up to the jury room. (T. pp. 166–67). Mr. Stacey contends that he was able to visit the juror during luncheon breaks and court recesses through the compliance of Deputy Marshals Cicchino and Alagna, the marshals assigned to guard the jury while in court. (Stacey aff., para. 8, 9; T. pp. 153, 166–67).

It is important to note that Mr. Stacey alleges that Deputy Marshal Cicchino was present during at least four luncheon meetings between Deputy Marshal Stacey and the juror during the last week of the trial. (T. pp. 331, 333). The witness further testified that he and Deputy Marshal Cicchino discussed the trial with the female jurors during these court house rendezvous. (T. pp. 83, 139–43, 160–62, 166–67, 182–85). When specifically questioned about these alleged conversations, he stated that on ei-

ther the Tuesday or Wednesday during the last week of the *Gross* trial, he and Deputy Marshal Cicchino assured the two jurors that Nelson Gross would not receive a jail sentence if found guilty as charged. (T. pp. 182–85).

Once again, this Court is faced with the task of determining whether this grave misconduct actually occurred; and once again Mr. Stacey is impeached through his own words and actions. This Court is of the opinion that no intimacies could have occurred in the courthouse corridor without the Court's attention being directed to this misconduct. The hallway in question is effectively a public corridor, in continual use by judges, jurors, clerks, attorneys and maintenance personnel.[14] It is therefore inconceivable that *any* private meetings took place in this hallway, much less have occurred in the manner depicted by Mr. Stacey.

This Court is further of the opinion that *no* courthouse meetings ever occurred. Mr. Stacey's daily logs reveal that he was assigned to various duties which kept him in and out of the courthouse during the final week of trial. As such, it would have been impossible for him to arrange luncheon meetings with the juror while he was elsewhere occupied. (T. pp. 593–99, 680–86; Gov't Ex. 30–34). Additionally, Mr. Stacey alleged that Deputy Marshal Cicchino was present during all courthouse rendezvous. However, an examination of Deputy Marshal Cicchino's logs reveal that he was not assigned to guard the jury from Monday, March 25, 1974 through Wednesday, March 27, 1974, but was likewise assigned to other duties which prevented him from contacting the jurors in question. Obviously, the four luncheon meetings never occurred.

More importantly, the conversation about Mr. Gross' possible sentence did not take place. This Court is of the opinion that Mr. Stacey fabricated this entire story, and is not entitled to any credence.[15]

## ANY ALLEDGED IMPROPRIETIES AFTER THE GROSS TRIAL ARE NOT THE CONCERN OF THIS COURT IN ITS DETERMINATION OF THE MATTER BEFORE THIS COURT

Although Mr. Stacey's allegations of improprieties after the *Gross* trial may have had circumstantial relevance to substantiate claims of prior misconduct, such matters have no relevance in view of this Court's determination that all allegations of misconduct during the pendency of the trial are false.

However, this Court cannot close its eyes to any indication of alleged improprieties in the Marshal's Office, and therefore will forward this information to the appropriate authorities for review.

## THE DEFENDANT'S REQUEST FOR A CONTINUED HEARING MUST BE DENIED

It is well established that courts have a solemn duty to fully investigate allegations of constitutional infirmities. *Lujan v. United States,* 424 F.2d 1053, 1055 (5th Cir. 1970). For this reason, the Court shall not deny a petitioner's request for a hearing unless the files and record before the Court clearly show that the petitioner is not entitled to any relief. *Lujan v. United States, supra.* This Court conducted an extensive hearing into the veracity of Mr. Stacey's

---

14. Although this corridor is closed at both entrances by a doorway which bears the legend "Judges' Corridor—Private", in practical effect it is a common passageway. It is not uncommon for persons coming off the elevators to use this passageway to travel down to the clerk's office, the library, or a certain judge's chambers.

15. Both Mr. Stacey and the petitioner's attorney offered to test Mr. Stacey's truthfulness by

having him submit to a polygraph test. This Court is of the opinion that the validity of the polygraph procedure has not been established, and therefore, its value is questionable. Consequently, the Court denies petitioner's application. *See United States v. Mayes,* 512 F.2d 637 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975); *United States v. Sockel,* 478 F.2d 1134 (8th Cir. 1973).

affidavit and the charges lain therein, and has concluded that Mr. Stacey's allegations cannot be accepted as true. Therefore, having carefully considered the evidence at the hearing, this Court finds that it must reject Mr. Stacey's allegations in their entirety, and consequently, finds that there is no factual basis to support petitioner's claim for relief.[16]

## CONCLUSION

Upon careful consideration of the testimony adduced at the hearing, as well as the legal memoranda and documents submitted for the Court's review, this Court is of the opinion that there is no factual basis for issuance of the writ of coram nobis, nor any factual issue justifying a more extensive hearing.[17] Accordingly, defendant's petition for writ of error coram nobis and his motion for an evidentiary hearing are denied.[18]

The government shall submit an appropriate order in conformity with this opinion within seven (7) days from the date hereof.

---

16. *See Bruno v. United States, supra* at 1263, wherein the court held that in passing on the motion for coram nobis, the district court has the right to reject any portions which he does not believe to be true.

17. Although a continuance of the hearing would be imperative if this Court found any substance to the allegations of contact between the United States Marshals and members of the *Gross* jury, this Court has found that the allegations are, for all material purposes, false. Accordingly, no presumption of prejudice arose, and there is no necessity for continued judicial scrutiny.

18. As previously stated, this Court lacks jurisdiction to grant defendant's motion for new trial. As such, this motion is also denied.

The government also moved for dismissal on alternative grounds of lack of jurisdiction, or on the grounds that the allegations totally lack credibility, bearing no basis in fact. This Court determined that jurisdiction did exist, and therefore, considered the motion on its merits. In practical effect, a denial of the defendant's motion has the same effect as granting the government's motion, and this opinion should be so construed.